[L.A. No. 30504. July 6, 1976.]

WESTLAKE COMMUNITY HOSPITAL et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES
COUNTY, Respondent;
SARAH KAIMAN, Real Party in Interest.

COUNSEL

Musick. Peeler & Garrett, Joseph A. Saunders and Karns & Karabian for Petitioners.

No appearance for Respondent.

Paul Caruso and James Alle for Real Party in Interest.

OPINION

**TOBRINER, J.**—Recent California decisions establish that before a public or private hospital may deny a doctor the right to practice his profession at that hospital, either by the termination of existing staff privileges or by the denial of an initial application for such privileges, the hospital must provide a fair procedure which affords the doctor an opportunity to answer the "charges" upon which his exclusion rests. (See, e.g., *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253]; *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623 [114 Cal.Rptr. 681].) In the instant case we must decide, in the light of these recent decisions, what procedural requisites, if any, a doctor who has been deprived of such

hospital privileges must fulfill before he may institute a tort action for damages.

For the reasons discussed below, we conclude initially that before a doctor may initiate litigation challenging the propriety of a hospital's denial or withdrawal of privileges, he must exhaust the available internal remedies afforded by the hospital. As we explain, this exhaustion of remedies principle has long been applied in suits attacking the actions of comparable "private associations," and we conclude that the doctrine applies when a doctor sues in tort for monetary damages as well as when he seeks a judicial order compelling reinstatement or admission.

We further conclude that whenever a hospital, pursuant to a quasi-judicial proceeding, reaches a decision to deny staff privileges, an aggrieved doctor must first succeed in setting aside the quasi-judicial decision in a mandamus action before he may institute a tort action for damages. As we point out, mandate has been the traditional means for reviewing analogous quasi-judicial determinations, and we believe that before hospital board or committee members are subjected to potential personal liability for actions taken in a quasi-judicial setting, an aggrieved doctor should be required to overturn the challenged quasi-judicial decision directly in a mandamus action. At the same time, however, we reject defendants' broad contention that a hospital and its board or committee members enjoy an absolute immunity from tort liability whenever by a quasi-judicial proceeding they deny hospital privileges; once the hospital's quasi-judicial decision has been found improper in a mandate action, an excluded doctor may proceed in tort against the hospital, its board or committee members or any others legally responsible for the denial of staff privileges.

1. *The facts of the instant case.*

In September 1974, plaintiff, Dr. Sarah Kaiman, instituted the underlying action against two private hospitals, Westlake Community Hospital (Westlake) and Los Robles Hospital (Los Robles), as well as numerous individual members of the hospitals' boards and committees. Dr. Kaiman's complaint alleged that she is a qualified doctor "whose professional ethics and qualifications are of the highest calibre," that she has been engaged in the private practice of medicine for 25½ years, that she is licensed to practice medicine in 4 states and has been licensed to practice medicine in California since March 1971. The complaint

further alleged that Dr. Kaiman had been accorded staff privileges at Westlake in December 1972 but that on November 28, 1973, the hospital revoked all of her staff privileges.

According to the complaint, Dr. Kaiman's revocation from Westlake was the result of a malicious conspiracy, engineered by all of the named defendants in order to destroy Dr. Kaiman's medical practice and to restrain competition in order to benefit each member of the conspiracy; the complaint alleged that in furtherance of the conspiracy defendants deliberately concealed the truth as to her qualifications to practice her profession. The complaint additionally alleged that the revocation of her privileges at Westlake "was pursued and perfected in a manner contrary to established principles of fairness and justice," and contrary to Westlake's own bylaws and constitution. Finally, the complaint alleged that Westlake and its board and committee members had maliciously conspired with Los Robles and certain of its board and committee members, and that, pursuant to such conspiracy, Los Robles had improperly denied Dr. Kaiman's application for staff membership.

On the basis of the foregoing allegations, the complaint asserted that plaintiff was entitled to substantial general and exemplary damages on a number of distinct theories: (1) intentional and unlawful interference with the right to pursue and practice a lawful calling and trade; (2) conspiracy to restrain competition; (3) intentional infliction of emotional distress; and (4) fraud and deceit.[1] The complaint did not seek either reinstatement to staff privileges at Westlake or the admission to staff privileges at Los Robles.

Several months thereafter, Westlake and the individual defendants associated with Westlake filed the motion for summary judgment which is at issue in the instant proceeding.[2] In support of the motion, defendants submitted numerous affidavits, some pertaining to the

---

[1]The complaint was framed in four separate "causes of action." The first "cause of action," alleging unlawful interference with the right to pursue a lawful calling or occupation, related only to the revocation of staff privileges at Westlake. The second, third and fourth "causes of action," resting, respectively, on theories of conspiracy to restrain competition, intentional infliction of emotional distress, and fraud and deceit, related both to the revocation of privileges at Westlake and to the denial of staff privileges at Los Robles.

[2]Neither Los Robles nor the named individual defendants associated with Los Robles joined in the motion and, indeed, these defendants have not appeared in the action to date at all; at oral argument we learned that the "Los Robles defendants" had not yet been served. Accordingly, hereinafter we shall use the terms "defendants" and

revocation of plaintiff's staff privileges at Westlake ("Westlake affidavits") and others relating to the denial of plaintiff's application for membership at Los Robles ("Los Robles affidavits").

In brief, the Westlake affidavits declared that between October 31, 1973, and November 20, 1973, an ad hoc committee composed of the chief of staff and two other doctors reviewed the hospital medical records and treatments of Dr. Kaiman and prepared a report for the hospital's credentials committee recommending the revocation of all of Dr. Kaiman's medical staff privileges; on November 20, the credentials committee considered the report, approved the recommendation and forwarded it to Westlake's board of directors, which subsequently approved the recommendation of revocation on November 28, 1973. The following day, the hospital notified Dr. Kaiman of its decision to revoke her privileges, informed her of her right under the hospital bylaws to request a quasi-judicial hearing before a judicial review committee, and advised her that she could continue to treat patients currently hospitalized until their discharge but that written consultation by another member of the hospital staff would be required as to treatment of new patients admitted to the hospital pending her hearing.

The Westlake affidavits further stated that a week later, Dr. Kaiman requested a hearing pursuant to the hospital's bylaws and that on January 31, 1974, a hearing took place before the hospital's judicial review committee. At the hearing, counsel appeared and represented both the executive committee of the hospital and Dr. Kaiman, both parties called witnesses and introduced documentary evidence, and the entire proceedings were transcribed by certified reporters; the hearing lasted approximately five hours. On March 20, 1974, the hospital informed Dr. Kaiman that the judicial review committee had determined that her staff privileges should be revoked, advising her of her right to appeal the decision to the hospital's board of directors at a meeting scheduled for that purpose on March 27, 1974. Dr. Kaiman

---

"Westlake defendants" interchangeably, to refer to Westlake and the individual defendants associated with Westlake.

Although the "Los Robles defendants" are not parties to the present proceeding, the events at Los Robles remain relevant, for the complaint alleges that the "Westlake defendants" were engaged, inter alia, in a conspiracy to exclude plaintiff from Los Robles and are thus liable for damages resulting from Dr. Kaiman's allegedly improper exclusion from that hospital. Accordingly, in the case at bar we must determine whether the trial court properly refused to grant the Westlake defendants summary judgment with respect to both the discharge from staff privileges at Westlake and the denial of staff privileges at Los Robles.

appeared before the board of directors on March 27 and presented her objections to the decision of the judicial review committee; the board of directors affirmed the decision of the judicial review committee and so notified Dr. Kaiman.

In addition to setting forth the foregoing chronology of events, the Westlake affidavits quoted a provision of the Westlake bylaws which reads in relevant part: "Each member of, or applicant to the Medical and Dental Staff, waives any right of personal redress against the Medical and Dental Staff, the Judicial Review Committee, the Governing Board, or any member thereof, for disciplinary action taken under this article."

The Los Robles affidavits related an entirely distinct chronology of events. According to these affidavits, Dr. Kaiman had been admitted to membership on the "courtesy staff" of Los Robles in December 1972, but had resigned from such membership in June 1973. On March 1, 1974, Dr. Kaiman filed a new application for admission to the Los Robles staff. From March 13, 1974, to May 10, 1974, the Los Robles staff contacted the references included in Dr. Kaiman's application and discovered information which contradicted some of the statements which Dr. Kaiman had made in her application concerning positions which she had previously held at other hospitals. The affidavits also disclosed that the hospital received additional information from a local physician with whom Dr. Kaiman had previously practiced which raised doubts as to Dr. Kaiman's professional competency.

On May 10, 1974, the Los Robles medical committee formally considered Dr. Kaiman's application and, according to the affidavits, determined that regardless of the outcome of Dr. Kaiman's dispute with Westlake, her application for membership at Los Robles should be denied because of the information disclosed by Los Robles' own investigation of her qualifications. Subsequently both the medical executive committee and the Los Robles board of trustees concurred in this decision, and on June 24, 1974, the hospital informed Dr. Kaiman that her application for membership had been denied.

Although the Los Robles affidavits do not indicate that the hospital ever informed Dr. Kaiman of the reason for her rejection or that she had any right to obtain a quasi-judicial review of the decision within the hospital hierarchy, one affidavit quotes a provision of the Los Robles

"Constitution and By Laws" which assertedly afforded her such a right. The section provides in full: "A member failing of appointment shall have the right of appeal to the Medical Executive Committee." According to this affidavit, Dr. Kaiman never appealed the denial of her application to the medical executive committee.

In moving for summary judgment, defendants asserted that the foregoing affidavits conclusively established the invalidity of plaintiff's suit with respect to the events at both hospitals. Insofar as Dr. Kaiman's action rested on the impropriety of her exclusion from Los Robles, defendants claimed that the affidavits demonstrated that she had failed to exhaust an available "private administrative" remedy and thus could not presently challenge the Los Robles exclusion in a judicial action.

With respect to the Westlake revocation, defendants contended that plaintiff's action was barred on three separate grounds. First, defendants claimed that the "waiver of redress" provision of the Westlake bylaws quoted above was effective to bar any recovery by plaintiff arising from the termination of staff privileges at the hospital. Second, they claimed that because the affidavits demonstrated that the revocation at Westlake was undertaken pursuant to a quasi-judicial proceeding, the actions of both the hospital and the individual members of its boards with respect to such revocation fell within the absolute privilege afforded by Civil Code section 47, subdivision 2. Third and finally, defendants asserted that even if either the hospital or its board members could be held liable for damages arising from the revocation under some circumstances, plaintiff could not "collaterally attack" the hospital's revocation decision by a tort action, but could only seek damages after she had succeeded in a "direct attack" on the quasi-judicial hospital decision in a mandamus proceeding.

Although plaintiff filed two counteraffidavits in response to the summary judgment motion, neither affidavit contested any of the factual assertions in the defendants' affidavits. Instead, the counteraffidavits simply reiterated plaintiff's allegations that the denial of staff privileges at both hospitals emanated from defendants' malicious conspiracy to interfere with plaintiff's practice of her profession, and that the Westlake and Los Robles procedures did not comply with general principles of fairness. Plaintiff resisted summary judgment on the ground that the competing affidavits revealed a disputed question of fact, namely, whether defendants had acted maliciously in denying plaintiff staff privileges at the two hospitals.

After reviewing the parties' affidavits and briefs, the trial court denied by minute order defendants' motion for summary judgment. Thereupon, defendants filed the instant proceeding, seeking a writ of prohibition to restrain the court from proceeding with the civil action. (See *American Society of Composers, Authors & Publishers* v. *Superior Court* (1962) 207 Cal.App.2d 676, 679 [24 Cal.Rptr. 772].) As noted above, we granted a hearing to determine what procedural prerequisites, if any, a doctor who has been denied hospital staff privileges must pursue before he may maintain an action for damages resulting from such denial.

2. *Although a plaintiff is required to exhaust all available internal remedies provided by an association before he may seek damages arising from expulsion or exclusion, defendants' affidavits do not establish either that the Los Robles bylaws afforded plaintiff such a remedy or that the hospital informed plaintiff of the availability of a review procedure.*

We turn initially to the defendants' contention that plaintiff may not seek recovery for damages resulting from her exclusion from Los Robles because she failed to exhaust the available internal administrative remedies afforded by the hospital.

As we explained in our second *Pinsker* decision, recent cases sanctioning judicial review of admission and exclusion practices of various professional associations and hospitals reflect the contemporary application of common law principles embodied in California decisions for almost a century. (See *Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d 541, 550-554.) From the earliest decisions reviewing actions of voluntary private associations, in which judicial review typically focused on the actions of fraternal or benevolent societies, our courts have recognized the applicability of the exhaustion of remedies doctrine in this context. (See, e.g., *Levy* v. *Magnolia Lodge, I.O.O.F.* (1895) 110 Cal. 297, 307-308 [42 P. 887]; *Robinson* v. *Templar Lodge, I.O.O.F.* (1897) 117 Cal. 370, 375-376 [49 P. 170]; *Neto* v. *Conselho Amor. etc.* (1912) 18 Cal.App. 234, 238 [122 P. 973].)

In *Holderby* v. *Internat. Union etc. Engrs.* (1955) 45 Cal.2d 843, 846 [291 P.2d 463], a plaintiff, without pursuing the internal appellate remedies of a labor union, sought reinstatement and damages after an alleged unlawful exclusion. This court explained: "It is the general and well established jurisdictional rule that a plaintiff who seeks judicial relief against an organization of which he is a member must first invoke

and exhaust the remedies provided by that organization applicable to his grievance. [Citations.] This rule is analogous to the rule requiring the exhaustion of administrative remedies as a condition precedent to resorting to the courts [citation] and to the rule requiring the parties to a contract for arbitration of disputes to exhaust those remedies before seeking judicial relief. [Citations.] Such rules . . . make possible the settlement of such matters by simple, expeditious and inexpensive procedures, and by persons who, generally, are familiar therewith. Such internal remedies are designed not only to promote the settlement of grievances but also to promote more harmonious relationships, and the courts look with favor upon them."[3]

Although plaintiff acknowledges that the exhaustion of remedies doctrine has frequently been applied in matters relating to the actions of private associations, she contends that the doctrine is only applicable when an individual seeks reinstatement or admission[4] to an organization and should not be applied to bar her tort action for damages. While early decisions in other jurisdictions frequently declined to apply the exhaustion doctrine to damage actions on the grounds that a private organization's internal review procedures generally did not provide a damage remedy (see, e.g., *Brotherhood of Railroad Trainmen* v. *Barnhill* (1926) 214 Ala. 565 [108 So. 456, 462]; *Bauer* v. *Samson Lodge, K.P.* (1885) 102 Ind. 262 [1 N.E. 571, 575-576]), contemporary out-of-state authorities have generally rejected this analysis and have refused to recognize an exception to the exhaustion requirement in the case of damage actions.

---

[3]Writing in the context of labor union disputes, Professor Summers has analyzed the policy considerations for requiring exhaustion of remedies as follows: "The doctrinal declaration that courts will not intervene in internal union disputes until all appeals within the union have been exhausted has, in theory, three underlying policies. First, union appellate tribunals may take corrective action, thus reducing the burden on the courts. Second, the benefit of the expert judgment of these tribunals might aid courts in making more responsible decisions. Third, the deep and pervading principle of preserving the autonomy of unions constrains courts to give the union full responsibility and opportunity to correct its own mistakes. Against these policies is balanced the policy of providing reasonably prompt and effective judicial protection to important legal rights." (Summers, *The Law of Union Discipline: What the Courts Do in Fact* (1960) 70 Yale L.J. 175, 207.)

[4]Although the *Holderby* decision describes the exhaustion doctrine as applicable to a "plaintiff who seeks judicial relief against an organization of which he is a member" (45 Cal.2d at p. 846), the policy considerations underlying the rule (see fn. 3, *ante*) make it clear that the exhaustion doctrine is equally applicable to an *applicant* for membership who has been denied admission to the organization. Plaintiff does not suggest that any distinction should be drawn between applicants who seek membership and those individuals whose membership has been revoked.

(See, e.g., *Kopke* v. *Ranney* (1962) 16 Wis.2d 369 [114 N.W.2d 485, 487-489]; *Falsetti* v. *Local Union etc.* (1960) 400 Pa. 145 [161 A.2d 882, 890].)

Although no prior California case has explicitly analyzed this issue, our court in *Holderby* v. *Internat. Union etc. Engrs., supra,* 45 Cal.2d 843, implicitly endorsed the position adopted by the more recent out-of-state cases by dismissing, for failure to exhaust internal remedies, an action which sought both reinstatement *and damages.* (See also *Simpson* v. *The Salvation Army* (1942) 49 Cal.App.2d 371 [121 P.2d 847]; cf. *Benson* v. *Screwman's Ben. Ass'n* (1893) 2 Tex.Civ.App. 66 [21 S.W. 562].) The *Holderby* majority reached this result in the face of the dissenting opinion's explicit argument that, at a minimum, the exhaustion doctrine should not constitute a bar to the plaintiff's damage claim. (See 45 Cal.2d at pp. 850-851 (Carter, J. dissenting).)

Plaintiff accurately notes that in the instant case, unlike *Holderby,* she seeks only damages, not reinstatement and damages. Nevertheless, the policy considerations which support the imposition of a general exhaustion requirement remain compelling in this context. In the first place, even if a plaintiff no longer wishes to be either reinstated or admitted to the organization, an exhaustion of remedies requirement serves the salutary function of eliminating or mitigating damages. If an organization is given the opportunity quickly to determine through the operation of its internal procedures that it has committed error, it may be able to minimize, and sometimes eliminate, any monetary injury to the plaintiff by immediately reversing its initial decision and affording the aggrieved party all membership rights; an individual should not be permitted to increase damages by foregoing available internal remedies. (See Summers, *Legal Limitations on Union Discipline* (1951) 64 Harv.L.Rev. 1049, 1089.)

Moreover, by insisting upon exhaustion even in these circumstances, courts accord recognition to the "expertise" of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance. (See *id.*) Finally, even if the absence of an internal damage remedy makes ultimate resort to the courts inevitable (see *Developments in the Law-Private Associations* (1963) 76 Harv.L.Rev. 983, 1075), the prior administrative proceeding will still promote judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review. ■ Accordingly, we conclude that the exhaustion of remedies doctrine fully applies to actions

seeking damages for an allegedly wrongful termination of or exclusion from membership in a private association. (See *Kopke* v. *Ranney, supra,* 16 Wis.2d 369 [114 N.W.2d 485].)[5]

■ Having reached this conclusion, we must determine if defendants' affidavits in fact establish that Dr. Kaiman's action arising out of the events at Los Robles is barred under the exhaustion doctrine so as to entitle defendants to summary judgment. (See *Zepeda* v. *Internat. Hodcarriers' etc. Union* (1956) 143 Cal.App.2d 609, 614 [300 P.2d 251].) As noted above, in contending that Dr. Kaiman failed to exhaust an available administrative remedy, defendants rely solely on one provision of the Los Robles bylaws which provides in full: "A *member* failing of *appointment* shall have the right to appeal to the Medical Executive Committee." (Italics added.)

Although defendants assert that this provision affords *an applicant who is denied membership* a right of appeal, at the very least the language of the provision (affording a right of appeal only to "members") is ambiguous. Defendants' affidavits fail to clarify this point; defendants cite no provision of the bylaws defining either the term "member" or "appointment." On this state of the record, we cannot say that defendants have demonstrated as a matter of law that plaintiff failed to exhaust an internal remedy which was available to her (cf. *Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 191-192 [344 P.2d 25]); accordingly, they were not entitled to summary judgment on this ground. (See *American Society of Composers, Authors & Publishers* v. *Superior Court, supra,* 207 Cal.App.2d 676, 690-691.)

Moreover, defendants' affidavits fail in another respect. Although the relevant affidavit states that Dr. Kaiman had not appealed her rejection to the Los Robles medical executive committee, it does not indicate that the hospital ever informed Dr. Kaiman that she had any such right under the hospital's bylaws. In our recent *Pinsker* decision we explained that

---

[5]In *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568], we held that a doctor's complaint, containing allegations very similar to the instant complaint, stated a common law cause of action for intentional and unjustifiable interference with the right to pursue a lawful business, calling, trade or occupation. In *Willis,* however, we did not address the exhaustion of remedies issue discussed herein, for the complaint alleged simply that plaintiff's staff membership had been terminated "without any hearing or assigned reason" (*id.,* at p. 808) and there was no indication that any internal remedy was available under the hospital's bylaws. (See also *Ascherman* v. *San Francisco Medical Society* (1974) 39 Cal.App.3d 623, 650-651 [114 Cal.Rptr. 681].)

"it is permissible for an association to initially reject an applicant without explanation, so long as the association clearly indicates to the applicant that, if he desires, the association will inform him of the reason for the rejection and will afford him an opportunity to respond." (12 Cal.3d at p. 555, fn. 13.) Inasmuch as the present affidavits do not indicate that Los Robles ever informed Dr. Kaiman that she had any right to contest the denial of membership privileges within the hospital's own hierarchy, defendants cannot rely on plaintiff's alleged failure to exhaust such remedies to bar her action. (See *Detroy* v. *American Guild of Variety Artists* (2d Cir. 1961) 286 F.2d 75, 80-81.)

█ Defendants contend, alternatively, that even if the doctrine of exhaustion of remedies does not bar plaintiff's tort action with respect to the events at Los Robles, the trial court should still have granted their motion for summary judgment as to Los Robles because plaintiff's sole remedy is to challenge the Los Robles exclusion by a writ of mandate, rather than in a tort action for damages. As we discuss, *infra,* we do conclude that when a hospital excludes or dismisses a doctor from staff privileges pursuant to a quasi-judicial proceeding, the aggrieved doctor must initially succeed in a mandamus action before pursuing a tort remedy. Plaintiff's exclusion at Los Robles however, was not undertaken pursuant to a quasi-judicial proceeding; the hospital did not inform plaintiff of the reason for her exclusion nor did it notify her of a right to respond to the charges against her.

Under similar circumstances in *Willis* v. *Santa Ana etc. Hospital Assn.,* *supra,* 58 Cal.2d 806, our court upheld an aggrieved doctor's right directly to institute a tort action for damages resulting from the exclusion; we reaffirm the *Willis* holding today. When a hospital denies staff privileges to a doctor without affording him the basic procedural protection to which he is legally entitled, the hospital and parties acting in concert with the hospital can offer no convincing reason or justification why they should be insulated from an immediate tort suit for damages. (See also *Ascherman* v. *San Francisco Medical Society, supra,* 39 Cal.App.3d 623, 650-651.)

Accordingly, we conclude that the trial court properly denied defendant's motion for summary judgment with respect to the events at Los Robles Hospital.

3. *Although the Westlake defendants do not enjoy an absolute immunity from liability, either by virtue of the hospital's bylaws or Civil Code*

*section 47, subdivision 2, plaintiff cannot maintain a damage action against the hospital or individual board members who participated in the quasi-judicial revocation proceedings until she has succeeded in setting aside the revocation in a mandamus proceeding.*

We turn now to the propriety of the trial court's ruling with respect to the events at Westlake hospital. Defendants' own affidavits reveal, of course, that plaintiff did fully exhaust all available internal remedies at Westlake and defendants make no claim that they are entitled to summary judgment with respect to the Westlake matter on the basis of the exhaustion doctrine discussed above. Defendants do contend, however, that summary judgment should have been granted with respect to the events at Westlake on the basis of three separate theories. We discuss each of these contentions in turn.

(a) *The Westlake bylaws.*

First, defendants rely upon one provision of the Westlake "Constitution and Bylaws" which they assert precludes plaintiff from seeking any recovery for losses occasioned by the termination of her staff privileges at the hospital. As noted above, the relevant section provides in part: "Each member of, or applicant to, the Medical and Dental Staff, waives any right of personal redress against the Medical and Dental Staff, the Judicial Review Committee, the Governing Board or any member thereof, for disciplinary action taken under this Article."

Although some early California decisions indicated that comparable bylaws could be effective to preclude any judicial action by an aggrieved member against a private association (see *Levy* v. *Magnolia Lodge, I.O.O.F., supra,* 110 Cal. 297, 309-310; *Robinson* v. *Templar Lodge, I.O.O.F., supra,* 117 Cal. 370, 374-375), more recent decisions of this court clearly demonstrate that an exculpatory clause of this nature transgresses public policy and cannot bar a plaintiff's access to the courts. Initially, insofar as the provision in question purports to bar a plaintiff's claim based on the *intentional* wrongdoing of the hospital or its staff, as is alleged in the instant case, Civil Code section 1668 leaves no doubt that the provision is invalid, for the section provides in relevant part: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another . . . are against the policy of the law."

Moreover, even as applied to nonwillful injuries inflicted by the hospital, we think the clause is invalid in light of the reasoning of *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]. In *Tunkl,* after canvassing the earlier California decisions dealing with contract clauses which purported to exculpate one party from liability resulting from negligence or other nonwillful misconduct, we set out "a rough outline" of the type of transaction in which exculpatory provisions are invalid. We stated: "[T]he attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (Fns. omitted.) (60 Cal.2d at pp. 98-101.)

Under these guidelines, we do not doubt that the instant exculpatory clause cannot stand. Hospitals, both public and private, are of course subject to extensive public regulation and provide a service of great importance to both the public and to doctors seeking to use their facilities. Moreover, hospitals are required to establish reasonable, nonarbitrary membership standards. (Cf., e.g., *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166 [81 Cal.Rptr. 623, 460 P.2d 495].) Such institutions certainly occupy a "superior bargaining position" to an individual physician with respect to the granting or withholding of their own membership privileges. Finally, the exculpatory clause in question, incorporated into the hospital's bylaws, constitutes the epitome of an adhesive provision, offered to affected doctors strictly on a "take it or leave it" basis.

Accordingly, we conclude that this provision of the Westlake bylaws does not bar plaintiff's action. To the extent that the decisions in *Levy* v. *Magnolia Lodge, I.O.O.F., supra,* 110 Cal. 297, 309-310 and *Robinson* v. *Templar Lodge, I.O.O.F., supra,* 117 Cal. 370, 374-375, are inconsistent with this conclusion, they are overruled.

(b) *Civil Code section 47, subdivision 2.*

 Defendants additionally contend that even without regard to the Westlake bylaw plaintiff's action must fail because both the hospital and its board and committee members are shielded from liability by an *absolute* privilege. Although defendants recognize that section 43.7 of the Civil Code explicitly establishes only a *conditional* privilege for individual members of a hospital board and provides no privilege at all for the hospital itself,[6] defendants contend that because the hospital's decision to revoke plaintiff's staff privileges emanated from a quasi-judicial proceeding, all actions of the hospital and its boards are clothed with the absolute privilege embodied in section 47, subdivision 2 of the Civil Code.

Section 47, subdivision 2, affords an absolute privilege (see, e.g., *Albertson* v. *Raboff* (1956) 46 Cal.2d 375, 379 [295 P.2d 405]) to any "publication or broadcast" made in connection with any legislative, judicial, or "other official proceeding authorized by law,"[7] and several

---

[6]Section 43.7 provides in full: "There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any member of a duly appointed committee of a state or local professional society, or duly appointed member of a committee of a medical staff of a licensed hospital (provided that the medical staff operates pursuant to written bylaws that have been approved by the governing board of the hospital), for any act or proceeding undertaken or performed within the scope of the functions of any such committee which is formed to maintain the professional standards of the society established by its bylaws, if such committee member acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he acts, and acts in reasonable belief that the action taken by him is warranted by the facts known to him after such reasonable effort to obtain facts. 'Professional society' includes legal, medical, psychological, dental, accounting, optometric, podiatric, pharmaceutic, chiropractic, and engineering organizations having as members at least a majority of the eligible licentiates in the area served by the particular society. The provisions of this section do not affect the official immunity of an officer or employee of a public corporation. [¶] This section shall not be construed to confer immunity from liability on any professional society or hospital. In any case in which, but for the enactment of the preceding provisions of this section, a cause of action would arise against a hospital or professional society, such cause of action shall exist as if the preceding provisions of this section had not been enacted."

[7]Section 47, subdivision 2, provides in relevant part: "A privileged publication or broadcast is one made . . . 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law . . . ."

Court of Appeal decisions have construed this provision to protect statements made in connection with quasi-judicial proceedings conducted by hospital boards. (See *Goodley* v. *Sullivant* (1973) 32 Cal.App.3d 619 [108 Cal.Rptr. 451]; *Ascherman* v. *Natanson* (1972) 23 Cal.App.3d 861 [100 Cal.Rptr. 656].) To the extent that plaintiff's present action rests upon an injury resulting from specific statements or testimony given by individual defendants during the Westlake proceedings, the action would be precluded under these authorities.

As we read Dr. Kaiman's complaint and affidavits, however, the gist of her claim is not that her injury has been occasioned simply by defendants' malicious *statements* at the proceedings, but rather that she has been injured by the malicious *actions* of the hospital and its committee members in revoking her staff privileges. As the Court of Appeal pointed out in *Goodley* v. *Sullivant, supra,* 32 Cal.App.3d 619, 624-625, it is section 43.7, and not section 47, subdivision 2, which "is concerned with the *actions* taken by a medical committee (i.e., refusing, suspending or revoking hospital privileges to any doctor)"; under section 43.7 such actions enjoy only a conditional privilege. Although, as plaintiff contends, section 47, subdivision 2, has on occasion been applied in contexts other than a defamation action (see, e.g., *Younger* v. *Solomon* (1974) 38 Cal.App.3d 289, 300-302 [113 Cal.Rptr. 113]), its absolute privilege has always attached only to *statements* or *publications* made in connection with the applicable proceeding. Accordingly, the trial court properly concluded that the section provided no absolute shield for defendants in this case.

(c) *Failure to have revocation set aside in mandamus action.*

■ Finally, defendants contend that even if they do not enjoy total immunity from liability under either the hospital bylaw or section 47, subdivision 2, plaintiff's damage action is at least premature. Defendants assert that before plaintiff may maintain a tort action against either the hospital or its board or committee members on the ground that the revocation of her hospital privileges was maliciously motivated, she must first successfully attack the quasi-judicial revocation decision in a mandamus proceeding. As far as we are aware, no prior decision in this state has addressed the narrow issue of whether an individual who has been expelled or excluded from membership in an association after being afforded a quasi-judicial proceeding may bring an immediate tort action for damages or must first succeed in setting aside the association's

decision in a separate mandamus action.[8] As we explain, we have determined that under the present circumstances, plaintiff should be required to proceed initially through a mandamus action; accordingly we conclude that, in this respect, defendant's motion for summary judgment should have been granted.

In contending that the present action for damages is premature, defendants assert that plaintiff's cause of action is analogous to a malicious prosecution action which can only be maintained after the allegedly maliciously initiated proceeding has terminated in favor of the person against whom it was brought. (See, e.g., *Jaffe* v. *Stone* (1941) 18 Cal.2d 146, 149 [114 P.2d 335, 135 A.L.R. 775].) In *Hardy* v. *Vial* (1957) 48 Cal.2d 577 [311 P.2d 494], this court explicitly held that the elements of a traditional malicious prosecution action apply to an action seeking damages resulting from a maliciously initiated administrative proceeding. Defendants argue that because the "private" administrative proceeding conducted by the hospital in the instant case parallels an ordinary "public" administrative proceeding, plaintiff ought to be barred from proceeding with her damage action until the administrative proceeding has been "terminated in her favor," i.e., until the hospital's revocation decision has been overturned in a judicial mandamus action.

We recognize, of course, that the plaintiff's present action is not precisely analogous to the malicious prosecution action at issue in *Hardy*. In *Hardy*, as in malicious prosecution cases generally, the plaintiff sought recovery against the parties who had initiated the charges against him; in the instant case, plaintiff seeks recovery against those who actually rendered the revocation decision against her. Moreover, the parallel between public and private administrative proceedings is not complete, for in the public sector those who render decisions in a quasi-judicial capacity enjoy an absolute immunity for their actions (see Gov. Code, § 820.2; *Downer* v. *Lent* (1856) 6 Cal. 94, 95-96), whereas in the hospital or professional association setting, the Legislature has afforded individual decisionmakers only a conditional privilege. (Civ. Code, § 43.7, quoted at fn. 6, *ante.*)

Despite these distinctions, however, we believe that the general policy underlying the "favorable termination" requirement in malicious prose-

---

[8]The few tort actions that have been pursued in this context have to date all involved exclusions or dismissals undertaken by hospitals without notice or hearing of any kind. (See *Willis* v. *Santa Ana etc. Hospital Assn., supra,* 58 Cal.2d 806; *Ascherman* v. *San Francisco Medical Society, supra,* 39 Cal.App.3d 623; *Tatkin* v. *Superior Court* (1958) 160 Cal.App.2d 745 [326 P.2d 201].)

cution actions applies in the present context. As in a malicious prosecution action, plaintiff's position rests on a contention that defendants intentionally and maliciously misused a quasi-judicial procedure in order to injure her; such a claim is necessarily premised on an assertion that the hospital's decision to revoke plaintiff's privileges was itself erroneous and unjustified. Although a quasi-judicial decision reached by a tribunal of a private association may not be entitled to exactly the same measure of respect as a similar decision of a duly constituted public agency (see Summers, *Legal Limitations in Union Discipline* (1951) 64 Harv.L.Rev. 1049, 1086), we believe that so long as such a quasi-judicial decision is not set aside through appropriate review procedures the decision has the effect of establishing the propriety of the hospital's action. (Cf. *Hollywood Circle, Inc.* v. *Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 731-733 [13 Cal.Rptr. 104, 361 P.2d 712].) Accordingly, we conclude that plaintiff must first succeed in overturning the quasi-judicial action before pursuing her tort claim against defendants.

In our view, the above requirement accords a proper respect to an association's quasi-judicial procedure, precluding an aggrieved party from circumventing the established avenue of mandamus review. In addition, this result will simplify court procedures by providing a uniform practice of judicial, rather than jury, review of quasi-judicial administrative decisions. (Cf. Code Civ. Proc., § 1094.5; *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634, 637 [234 P.2d 981].)

Finally, this procedure affords a justified measure of protection to the individuals who take on, often without remuneration, the difficult, time-consuming and socially important task of policing medical personnel. Because such individuals remain ultimately subject to suit, the procedure outlined above does not conflict with the legislative decision to afford only a conditional privilege to these decisionmakers (see Civ. Code, § 43.7); once a court determines in a mandamus proceeding that an association's quasi-judicial decision cannot stand, either because of a substantive or procedural defect, the prevailing party is entitled to initiate a tort action against the hospital and its board or committee members or staff.[9]

---

[9]Although defendants claim that plaintiff must not only succeed in having the quasi-judicial determination set aside by a mandamus action but must also obtain a court order *requiring reinstatement,* we do not believe that the additional requirement of a reinstatement order should be made a prerequisite to filing a tort action for damages. There are many circumstances in which it may be inappropriate for a court immediately

In the present case, although the hospital revoked plaintiff's staff privileges at Westlake pursuant to a quasi-judicial proceeding, plaintiff did not challenge the revocation through a mandamus proceeding but instead immediately instituted the instant action. For the reasons discussed above, we believe that the tort action is premature insofar as it rests on the Westlake revocation and thus that the trial court should have granted defendant's motion for summary judgment with respect to the Westlake revocation. (See Code Civ. Proc., § 437c, 6th par.)[10]

### 4. *Conclusion.*

We summarize our conclusions as to events at Los Robles Hospital. First, we have determined that although a doctor who has been denied hospital staff privileges must exhaust all available internal remedies before instituting any judicial action, including an action seeking only damages, the affidavits in the instant case do not establish that Los Robles provided an available remedy which plaintiff failed to exhaust. Second, we have concluded that because Los Robles undertook the exclusion without notice or hearing, plaintiff is not precluded from immediately instituting a tort action for damages sustained as a result of such exclusion.

We sum up our conclusions as to the revocation of privileges at Westlake Community Hospital. We have explained that the exculpatory clause contained in Westlake's by-laws does not bar plaintiff's action and that Civil Code section 47, subdivision 2, does not provide an absolute privilege to either Westlake or its board or committee members in regard to the revocation of plaintiff's staff privileges. Finally, we have decided that because plaintiff has not yet succeeded in setting aside the

---

to order a hospital to accord a doctor staff privileges; if, for example, the hospital has failed to provide an applicant a proper hearing before rejection, a court may well decide that the appropriate remedy is simply to order a proper hearing rather than to mandate that the hospital grant staff privileges to a possibly unqualified applicant. (See *Pinsker* v. *Pacific Coast Society of Orthodontists, supra,* 12 Cal.3d at p. 557, fn. 17; cf. *Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 599 [25 Cal.Rptr. 551, 375 P.2d 431].) Even when reinstatement is not ordered, however, the judicial reversal of the hospital's quasi-judicial decision does remove the presumptive validity of such decision and the aggrieved doctor should thereafter be permitted to pursue his tort remedies without further delay.

[10]Although the allegations in plaintiff's complaint could conceivably be found sufficient to warrant treating the complaint as a petition for writ of mandate (cf. *Boren* v. *State Personnel Board, supra,* 37 Cal.2d 634, 638), plaintiff, at oral argument, disclaimed any desire to have the complaint recast in such a light. Accordingly, we do not pursue the point.

quasi-judicial revocation at Westlake, she may not maintain a tort action for damages arising from such revocation.

In compelling the exhaustion of available hospital remedies and in requiring that a hospital's quasi-judicial denial of staff privileges, if wrongful, be first set aside, we seek to accommodate the divergent interests involved here. Our court has long recognized, of course, that the existence of unrestrained authority in hospital boards or professional associations has at times enveloped an arbitrary selectivity that threatened to convert the operating room into the province of an elite clique. Our past decisions demonstrate that this court has been adamant in its endeavor to eradicate monopolistic control of professional opportunities.

At the same time, however, we must realistically acknowledge that nonmedical hospital board members and doctors who undertake the hard task of selecting those who are to be accorded the use of the hospital must labor under a heavy burden. Their function is both to attempt to protect the hospital from malpractice suits that may arise from inadequate performance and to insure, so far as possible, that the hospital renders that high quality health care that is more and more the imperative of governmental beneficences. Such board members and doctors frequently donate their time and talents on a volunteer basis. When such individuals pursue their tasks under procedures which accord an aggrieved doctor an opportunity to rebut the charges against him, we believe they are entitled to the modicum of protection provided by the procedural requirements discussed above.

Accordingly, the alternative writ is discharged and a peremptory writ of mandate shall issue, directing the trial court to vacate the challenged order insofar as such order denies defendants' motion for summary judgment with respect to the revocation of plaintiff's staff privileges at Westlake Community Hospital. (Code Civ. Proc., § 437c, 6th par.) In all other respects, the requested relief is denied. Each party shall bear its own costs.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

The petition of the real party in interest for a rehearing was denied September 3, 1976.