[Civ. No. 18455. Third Dist. Apr. 15, 1980.]

JEFFREY APPLEBAUM, Plaintiff and Respondent, v.
BOARD OF DIRECTORS OF BARTON MEMORIAL HOSPITAL,
Defendant and Appellant.

COUNSEL

Wilke, Fleury, Hoffelt & Gray, Joe S. Gray and Alan G. Perkins for Defendant and Appellant.

Horan, Lloyd & Karachale and Charles G. Warner for Plaintiff and Respondent.

OPINION

**REYNOSO, J.**—A private hospital board (hereinafter Hospital) appeals from a judgment granting a doctor's petition for a writ of administrative mandamus (Code Civ. Proc., § 1094.5) compelling restoration of his obstetrical staff privileges. The hospital asserts the vitality of the peer review concept. Its principal argument is that the trial court erred in its conclusion that the hospital procedures are impermissibly unfair. We affirm the judgment.

I

Plaintiff is a licensed physician and a board certified family practitioner. He began private practice in the South Lake Tahoe area in 1976, became an associate staff member at the hospital in May of that year, and was accepted as an active staff member a year later.

The hospital is a private, nonprofit institution with an open medical staff. In January of 1978, there were 14 general and family practition-

ers on the staff. Five doctors, including plaintiff, had obstetrical privileges at the hospital. Two of the five, Drs. Furman and Hembrow, were board certified specialists in obstetrics; they were also associated in their practice. Two general practitioners and plaintiff had privileges for uncomplicated deliveries only; they were expected to consult with specialists in nonroutine cases. There were also two pediatricians on the department staff.

## A. *Hospital Proceedings*

The present controversy began when the head nurse and the night supervisor in obstetrics expressed concern about plaintiff's delivery techniques to the hospital administrator and to Dr. Furman. Furman wrote to the hospital's chief of staff transmitting the nurses' complaints and requesting an investigation pursuant to the hospital's bylaws. As grounds for his request, Furman listed incompetence in the performance of deliveries and care of the newborn, unauthorized use of experimental drugs, falsification of medical records, improper conduct of labor, and the performance of procedures exceeding granted privileges.

The matter was discussed at a meeting of the executive committee of the hospital on September 29, 1977. Both Furman, as chief of surgery, and Hembrow, as chief of obstetrics, were members of the committee. Furman refrained from voting on decisions concerning plaintiff's privileges at all stages of hospital proceedings. An ad hoc committee, composed of the six physician members of the obstetrics department, including Furman and Hembrow, was appointed by the chief of staff to investigate the charges against plaintiff. Furman was asked to chair the committee but he declined to act in that capacity.

The ad hoc committee met on October 3. Dr. Furman presented his letter and those from the nurses. He also discussed eight patient records in which he found problems with plaintiff's treatment. Drs. Auerback and McFarren, pediatricians, commented unfavorably on five patient records and Auerback expressed his feeling that plaintiff at times treated cases which were beyond his expertise as a family practitioner. Dr. Hembrow commented that he had seen plaintiff perform some procedures in a way he felt showed "gross inexperience in most instances."

When plaintiff appeared before the committee, he objected to the charges in Furman's letter as vague and to the failure of the bylaws to

allow him representation at the meeting. He also claimed the presence of Furman and Hembrow on the committee destroyed its impartiality because their feelings were adverse to him. Dr. Furman then led the committee's questioning of plaintiff concerning his use of drugs not approved by the Federal Drug Administration, lack of consultation with other doctors on some problems and delivery of breech babies. Plaintiff told the committee that he used the non-FDA approved drugs only on two patients who had been placed on the medication previously by Sacramento obstetricians and on one patient after a telephone consultation with Sacramento Medical Center personnel. He also commented on the difficulties of obtaining consultations from Dr. Hembrow on patients receiving Medi-Cal benefits and on Dr. Furman's criticism of his handling of case in which he had asked Furman to assist. Plaintiff had previously (Aug. 18, 1977) written a letter to the executive committee pointing out the lack of adequate consultation from obstetricians for Medi-Cal patients. At the conclusion of the meeting plaintiff indicated his willingness to follow more detailed guidelines for obstetrics and to undergo a trial period provided consultation was made available to him.

The ad hoc committee agreed plaintiff had shown evidence of poor medical judgment and incompetence in the performance of deliveries and care of the newborn in that he had used experimental drugs without proper authorization and mismanaged labor by excessive use of drugs and improper combinations of drugs. It found plaintiff performed contraindicated procedures, procedures in excess of his privileges for uncomplicated deliveries, and failed to obtain proper consultation. A majority of the ad hoc committee recommended to the executive committee that plaintiff's obstetrical privileges be suspended after he had completed the care of patients presently at 32 weeks' gestation and delivered them under the supervision of other physicians in the obstetrics department.

The ad hoc committee's report was submitted to a meeting of the executive committee on November 22 after the members of the executive committee had been given time to review the transcript of the ad hoc committee hearing. Five of the members of the ad hoc committee (all but Dr. McFarren) attended the executive committee meeting; six other physicians and the hospital administrator were also present. The executive committee interviewed plaintiff and discussed possible recommendations limiting his staff privileges in obstetrics. It reconvened on November 29, and after further discussion decided that

plaintiff should perform all deliveries until January 1, 1978, with another member of the obstetrics staff and place the newborns under the supervision of the pediatrics service, and that after January 1, 1980, plaintiff's obstetrical privileges would be suspended until he had completed further training satisfactory to the executive committee and served a probationary period in which he would transfer primary care of any nonroutine delivery to another member of the obstetrics staff.

On December 6, 1977, the hospital administrator wrote to plaintiff informing him of the executive committee's recommendation and summarily suspending him in accordance with the terms of the recommendation. The letter included the executive committee's findings that plaintiff had failed to obtain pediatric consultations in thirteen specified cases, failed to obtain obstetrical consultations in thirty-four cases, demonstrated incompetent techniques in delivery and resuscitation in two cases, used improper drugs inappropriately in three cases, exceeded his privileges by using a vacuum extractor in two cases, and used dangerous combinations of high doses of narcotics and narcotic antagonists in three cases. Patient record numbers were given for each of the charges. The executive committee later deferred the January 1 suspension until a recommendation from the medical staff appeal committee was received.

Plaintiff then requested review of the executive committee's decision by a medical staff appeal committee pursuant to the hospital bylaws. Members of the appeal committee were three physicians not previously involved in the dispute. The committee held formal hearings on January 11 and January 28, 1978; it heard testimony from the hospital administrator, plaintiff, Dr. Furman, the two general practitioner members of the obstetrics staff, an expert for the hospital, and one for plaintiff.

On January 19, 1978, between the two appeal committee meetings, Dr. Furman wrote to plaintiff informing him he would no longer do consultations. Furman's letter was presented to the appeal committee as an exhibit.

After the lunch break at the second meeting of the appeal committee, counsel for the hospital asked that the record reflect the composition of the executive committee had changed after the appeal committee was appointed and asked the two appeal committee members who were now also serving on the executive committee to indicate they would refrain

from taking part in the executive committee's future consideration of plaintiff's hospital privileges. The two members agreed. Counsel indicated the question of overlapping membership had been raised by plaintiff in an unsuccessful attempt to obtain a writ of mandate from the superior court the day before the second appeal committee meeting.

Counsel for plaintiff told the committee that one basis for the writ application was his concern that the members on the appeal committee may have been influenced by discussions about plaintiff at the January 24 meeting of the executive committee. Plaintiff had attempted to obtain a tape recording of the meeting but had not been able to do so. None of the committee members made any comment on this information and the hearing proceeded.

The appeal committee voted agreement with the recommendation that plaintiff's obstetrical staff privileges be suspended and the executive committee ratified the decision on January 30, 1978.

## B.  *Superior Court Proceedings*

Plaintiff filed his writ petition in superior court on February 1, 1978, contending that the hospital proceedings violated due process of law because both the ad hoc committee and the appeal committee were prejudiced against him, the former by the presence of the complaining physician and the latter by disparaging remarks about his character and personality made at the January 24 executive committee meeting in the presence of two of the three appeal committee members. In a declaration attached to the petition, plaintiff asserted Drs. Furman and Hembrow had shown increasing reluctance to consult on Medi-Cal patients before October of 1977. He claimed 40 percent of his income was derived from obstetrical practice and a substantial portion of his obstetrical patients were Medi-Cal patients. He also claimed disparaging and untrue remarks about him had been made during a discussion of his case at the executive committee meeting on January 24 in the presence of two appeal committee members while the appeal committee hearings were in recess and that before the appeal committee began deliberations counsel for the hospital had informed his counsel that an adverse decision would be served on plaintiff within two days.

The court issued an alternative writ on February 7, 1978. The parties later stipulated that plaintiff had exhausted his administrative remedies,

the appeal committee decision had been accepted by all relevant hospital authorities, and all proceedings following the appeal committee hearings were fair and provided adequate due process.

The hospital's answer to plaintiff's petition denied the allegations of unfairness in any of the proceedings and admitted only that the appeal committee members were "sometimes present" at the January 24 executive committee meeting.

A hearing was held in superior court on April 13, 1978. Counsel for plaintiff argued that the evidence was insufficient to support suspension of obstetrical privileges, and that due process had been violated in the hospital proceedings. On the other hand, counsel for the hospital argued that the record would support an independent judgment that the privileges were properly suspended and plaintiff's rights to fair procedure had been protected at all stages of the proceedings.

On August 24, 1978, the court issued a memorandum decision in which it concluded: (1) independent review of the record showed the main areas of contention about plaintiff's obstetrical procedures revolved around professional differences, (2) the guidelines under which plaintiff made the questioned decisions defined very broadly the complications requiring consultations, (3) due process was initially violated by the presence of Dr. Furman on the ad hoc committee, and (4) further due process violations occurred when appeal committee members heard disparaging comments about plaintiff. The court also found the testimony at the ad hoc and appeal committee proceedings did not establish malpractice by plaintiff but did demonstrate that he was not capable of dealing with all the complications of delivery, had difficulty obtaining proper consultations and failed to keep adequate records of treatment and consultation. The court speculated that the lack of complete records resulted in some of the ad hoc committee's adverse findings and that petitioner would voluntarily further his education through continued training.

The hospital requested findings of fact and conclusions of law which it later contested at a hearing on October 23, 1978. Judgment for plaintiff was entered on October 24, 1978, and the final findings were filed November 17, 1978. The findings of fact reflected the opinions of the court given in the memorandum decision. The court reached three legal conclusions: (1) Dr. Furman's role in the ad hoc committee proceedings

violated due process of law, (2) due process was again violated when appeal committee members heard disparaging comments about plaintiff at the executive committee meeting, and (3) independent review of the record showed the evidence was insufficient to support the hospital's action.

The hospital then moved for a new trial, contending the proceedings met applicable standards of due process, the use of plaintiff's declaration to support the factual finding that prejudicial derogatory remarks were made was improper, and the evidence was insufficient to support the court's conclusion. A 1978 amendment of the Code of Civil Procedure section 1094.5, subdivision (d) to provide for a substantial evidence standard of review for claims of abuse of discretion by private hospital boards was called to the court's attention by a letter from the hospital on January 17, 1979, after the new trial motion was heard and submitted.

The new trial motion was denied on January 26, 1979. The court concluded the statute was not retroactive and had no effect in the present case. It also noted that it considered Dr. Furman's participation in the initiation, investigation and initial adjudication of the charges against plaintiff a violation of minimal guarantees of due process. The hospital then appealed.

## II

### A. *Fairness Lacking in Hospital Procedure*

We first consider the trial court's conclusion that the hospital proceedings were impermissibly tainted by the role of plaintiff's accuser, Dr. Furman, in the adjudicatory process. The issue appears to be a novel one in this setting. ■ Although California courts have long recognized a common law right to fair procedure protecting individuals from arbitrary exclusion or expulsion from private organizations which control important economic interests (*James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]; *Pinsker* v. *Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253]; *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410]), review of private hospital staff decisions has only recently been accomplished via administrative mandamus proceedings. (*Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802 [140 Cal.Rptr. 442, 567 P.2d 1162].)

Since the actions of a private institution are not necessarily those of the state, the controlling concept in such cases is fair procedure and not due process. Fair procedure rights apply when the organization involved is one affected with a public interest, such as a private hospital. (See Sloss & Becker, *The Organization Affected With A Public Interest and Its Members - Justice Tobriner's Contribution to Evolving Common Law Doctrine* (1977) 29 Hastings L.J. 99.)

The distinction between fair procedure and due process rights appears to be one of origin and not of the extent of protection afforded an individual; the essence of both rights is fairness. Adequate notice of charges and a reasonable opportunity to respond are basic to both sets of rights. (*Ezekial* v. *Winkley* (1977) 20 Cal.3d 267 [142 Cal.Rptr. 418, 572 P.2d 32]; *People* v. *Ramirez* (1979) 25 Cal.3d 260 [158 Cal.Rptr. 316, 599 P.2d 622].)

Specific requirements for procedural due process vary depending upon the situation under consideration and the interests involved. (*People* v. *Ramirez, supra*, at p. 264; *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 33, 96 S.Ct. 893].) Where due process requires an administrative hearing, an individual has the right to a tribunal "which meets at least currently prevailing standards of impartiality." (*Wong Yang Sung* v. *McGrath* (1950) 339 U.S. 33, 50 [94 L.Ed. 616, 628, 70 S.Ct. 445].) Biased decision makers are constitutionally impermissible and even the probability of unfairness is to be avoided. (*Withrow* v. *Larkin* (1975) 421 U.S. 35, 47 [43 L.Ed.2d 712, 723, 95 S.Ct. 1456]; *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623].) The factor most often considered destructive of administrative board impartiality is bias arising from pecuniary interests of board members. (See *American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983 [138 Cal.Rptr. 594], and cases cited therein.) Personal embroilment in the dispute will also void the administrative decision (*Mennig* v. *City Council* (1978) 86 Cal.App.3d 341 [150 Cal.Rptr. 207]), although neither prior knowledge of the factual background which bears on a decision nor prehearing expressions of opinions on the result disqualifies an administrative body from acting on a matter before it. (*City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 782 [122 Cal.Rptr. 543, 537 P.2d 375].)

Due process questions are raised when the administrative agency's initial view of the facts based on evidence derived fron nonadversarial

processes as a practical or legal matter forecloses fair and effective consideration of the merits at an adversary hearing leading to the ultimate decision. (*Withrow v. Larkin, supra*, 421 U.S. at p. 58 [43 L.Ed.2d at p. 730].) This is exactly the claim that plaintiff made to the trial court and the basis for the judgment below. We see no impediment to an analysis of the situation using the precedents established under the due process concept. Our Supreme Court has declined to fix rigid procedures for the protection of fair procedure rights (*Ezekial v. Winkley, supra*, 20 Cal.3d at p. 278), but it is inconceivable to us that such rights would not include impartiality of the adjudicators.

Before proceeding along these lines, however, we pause to note another apparently unique feature of this case. The hospital's action did not completely eliminate plaintiff's staff privileges or remove him from staff membership. There is no indication in the record that his use of hospital facilities other than those in the obstetrical department was affected by the investigation and adjudication. Since plaintiff testified that about 40 percent of his income was derived from his obstetrical practice, his interest in obstetrical privileges was substantial and we do not find that a partial exclusion of this magnitude merits any less procedural protection than revocation of full staff membership. Neither party argues otherwise.

Plaintiff's position before the trial court is a familiar one in the context of administrative law. Without using the term, he contended the ad hoc committee proceedings constituted an impermissible combination of investigatory, prosecutional and adjudicatory functions in that body.

The combination of functions argument often arises in the context of professional licensing revocation cases when an administrative board adjudicates competence issues after its agents have instigated and investigated charges against a licensee. Since the situation before us is in many ways analogous to a license revocation, we will examine the precedents in that area. The federal position on the issue is that due process is not violated by the combination of investigative and adjudicative functions unless the facts of a case show foreclosure of fairness as a practical or legal matter. (*Withrow v. Larkin, supra*, 421 U.S. 35.) Most states, including California, have taken the same approach to combination of functions argument. (See Davis, *Case Commentary: Withrow v. Larkin and the "Separation of Functions" Concept in State Administrative Proceedings* (1975) 27 Admin.L.Rev. 407; *Winning v.*

*Board of Dental Examiners* (1931) 114 Cal.App. 658 [300 P. 866]; *Griggs* v. *Board of Trustees* (1964) 61 Cal.2d 93 [37 Cal.Rptr. 194, 389 P.2d 722]. But see *Abrams* v. *Jones* (1922) 35 Idaho 532 [207 P. 724]; *State* v. *Kelly* (1960) 145 W.Va. 70 [112 S.E.2d 641].)

California law requires that disciplinary hearings of designated state agencies be conducted by administrative law judges from the state Office of Administrative Hearings. (Gov. Code, § 11502.) The administrative law judge prepares and submits a proposed decision for the agency's consideration. (Gov. Code, § 11517, subd. (c).) Although the agency need not adopt the decision, it is required to review the record of the hearing before arriving at a different conclusion. (*Ibid.*) These statutory requirements reflect legislative concern with due process and fair hearings in administrative proceedings. (Clarkson, *Practice Before California Licensing Agencies* (1956) 44 Cal.L.Rev. 197.) Legislation in at least two other states (Maine and Missouri) goes further and makes the findings of hearing officers binding on the agency unless the agency succeeds in a later court proceeding. (See Sandberg et al., *Fair Treatment For the Licensed Professional: The Missouri Administrative Hearing Commission* (1972) 37 Mo.L.Rev. 410; Sawyer, *The Quest For Justice In Maine Administrative Procedure: The Administrative Code in Application and Theory* (1966) 18 Me.L.Rev. 218.)

In the case before us, of course, there was no administrative law judge or other third party involved in the factual determinations which resulted in revocation of plaintiff's obstetrical privileges. The investigation was not conducted by state employees insulated from the adjudicatory body by layers of public bureaucracy; it was done by a group which included the instigator of the charges, had overlapping membership in the body (executive committee) which reviewed both the initial and final decisions and to which the majority of the formal adjudicators later belonged. ■ The question before us is whether this situation, completely apart from any question of actual bias on the part of any of the physicians involved and from the merits of the charges, presents a violation of fair procedure rights to an impartial tribunal by virtue of a practical probability of unfairness. We hold that it does.

As a practical matter and without in any way impugning their good faith, the general practitioner and pediatric specialist members of the ad hoc committee were in an extremely difficult position. The charges were brought by one of the two specialists on whom they were accus-

tomed and, indeed, required to rely for obstetrical expertise and with whom they were in frequent and intimate professional contact. His associate supported the charges and the committee was thus presented with a solid front of the only special expertise available to it. To presume impartiality of the ad hoc committee in such circumstances goes beyond what can reasonably be expected of human beings in this professional setting. In this situation a realistic appraisal of psychological tendencies and human weakness compels the conclusion that the risk of prejudgment or bias was too high to maintain the guarantee of fair procedure. (See *Withrow* v. *Larkin, supra*, 421 U.S. 35.)

We recognize that the ad hoc committee's function under the hospital bylaws was nominally investigatory, not adjudicative. Nevertheless, the chances of a contradictory conclusion by another body within the hospital were virtually nil. The bylaws mandated review of the ad hoc committee's decision by the executive committee, an apparently twelve-member body upon which five members of the ad hoc committee sat. Having made an adverse decision, the five could hardly be expected not to support it before the executive committee. The appeal committee, later also connected to the executive committee, was composed of doctors from other departments within the hospital. Although the appeal committee did hear testimony from an obstetrical specialist in plaintiff's defense, half of the hospital's obstetrics department and another specialist testified adversely. To some extent, at least, the same psychological factors which impugned the impartiality of the ad hoc committee were at work on the appeal committee members. At the very least, they would be tempted to consider extraneous matters, such as the personal collegial preferences of the obstetrics department members, in addition to the merits of the charges. We paraphrase Justice Taft's remarks in *Tumey* v. *Ohio* (1927) 273 U.S. 510, 532 [71 L.Ed. 749, 758, 47 S.Ct. 437, 50 A.L.R. 1243]: Every procedure which would offer a possible temptation to the average man as a judge which might lead him not to hold the balance nice, clear and true between the accused and accuser denies the former due process of law. The procedure at issue here, given the circumstances in which it was accomplished, violated this standard of fairness. The fatal flaw in the proceedings before us was the lack of impartiality in the fact-finding process.

## B. *Trial Court Reinstatement Order Proper*

■ Since we affirm the judgment on the basis of fair procedure defects in the administrative process, we need address only one more of

the hospital's arguments. The hospital claims the order of reinstatement somehow usurped its discretion to determine whether plaintiff should retain his obstetrical privileges and a proper order would have been a remand for additional proceedings. There is no merit in this contention; fair hearings are not a matter of discretion but are required by law. Reinstatement pending a proper administrative hearing does not preclude exercise of the hospital's legally vested discretion to exclude from its facilities physicians it properly concludes do not meet its standards. (*Hackethal v. Loma Linda Community Hospital Corp.* (1979) 91 Cal. App.3d 59, 67 [153 Cal.Rptr. 783].) The trial court properly restored the status quo.

The judgment is affirmed.

Evans, Acting P. J., and Blease, J., concurred.

A petition for a rehearing was denied May 15, 1980, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied June 25, 1980. Richardson, J., was of the opinion that the petition should be granted.