[No. A114651. First Dist., Div. Three. Mar. 25, 2008.]

PALM MEDICAL GROUP, INC., Plaintiff and Appellant, v.
STATE COMPENSATION INSURANCE FUND, Defendant and Appellant.

208

**COUNSEL**

Roxborough, Pomerance & Nye, Drew E. Pomerance and Erin M. LaBrache for Plaintiff and Appellant.

David Bryan Leonard as Amicus Curiae on behalf of Plaintiff and Appellant.

Robert W. Daneri, Vera C. DeMartini; Sonnenschein Nath & Rosenthal, Paul E. B. Glad, Steven H. Frankel and Sean McEneaney for Defendant and Appellant.

Thelen Reid Brown Raysman & Steiner, Daniel Sovocool and Jennifer McGlone for California Chamber of Commerce as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Saul Allweiss and Michael A. Marks for California Workers' Compensation Institute as Amicus Curiae on behalf of Defendant and Appellant.

Donald H. Crane for California Association of Physician Groups as Amicus Curiae on behalf of Defendant and Appellant.

Gretchen M. Lachance for California Association of Health Plans as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**POLLAK, J.**—Palm Medical Group, Inc. (Palm), an occupational medical clinic located in Fresno, was denied admission into the preferred provider network (PPN) operated by State Compensation Insurance Fund (SCIF), a California public enterprise fund operating throughout the state as a nonprofit workers' compensation insurer. After a four-week trial, a jury found that SCIF had excluded Palm in violation of the common law fair procedure doctrine and awarded Palm damages of $1,131,000. The trial court subsequently granted SCIF's motion for judgment notwithstanding the verdict on the ground that there was insufficient evidence to establish a duty on the part of SCIF to afford Palm fair procedure in considering its application for admission to the PPN. Palm contends the trial court erred in granting SCIF's motion for judgment notwithstanding the verdict, and also in denying its request for an injunction requiring SCIF to admit Palm to the PPN. SCIF—supported by several amici curiae—defends the judgment on the basis of the trial court's reasoning and on numerous additional grounds. SCIF also argues that damages are not an available remedy for a violation of the fair procedure doctrine and that the jury's award is speculative in any event.

Having reviewed the trial transcript and the documentary evidence, we conclude the trial court erred in granting judgment notwithstanding the verdict. The record includes ample evidence to support the jury's finding that SCIF "possessed power so substantial over the market for the treatment of occupational injuries in the Fresno area in 2001–2002 that the failure to admit an ordinary, competent medical provider to its [PPN] would significantly impair that provider's ability to practice occupational medicine in the Fresno area" and, therefore, that SCIF owed Palm a duty of fair procedure in acting on its application to the PPN. We find no merit in SCIF's alternate arguments in support of the judgment. Nor do we agree with Palm that it was entitled to injunctive relief. Accordingly, we shall reverse the judgment and reinstate the jury verdict.

## BACKGROUND

*SCIF and its PPN*

As indicated above, SCIF is a nonprofit workers' compensation insurer. As described in greater detail below, it is the largest workers' compensation carrier in California. In 1996 it established a PPN program as "a coordinated care program designed to provide quality medical care, reduce workers' compensation costs for employers and maintain employee productivity through medical management and early return to work efforts." Through this program, SCIF aimed "to improve the quality of care[,] . . . improve the timeliness of reports and information that would be shared between policy holders, injured workers, their treating physicians and [itself, and] to reduce disability durations whenever possible." The program was designed to create a network of "the highest quality, highest credentialed, best trained practitioners in occupational medicine."

Within the constraints of the workers' compensation law as it existed prior to 2005, SCIF's evidence showed, "[t]he PPN enable[d] employers to exert their control over medical treatment . . . by sending injured workers to experienced occupational health providers who [would] work closely with employers and [SCIF] claims adjusters and develop effective treatment plans."[1] In exchange for participation in the program, employers received a 10 percent discount on their insurance premiums. Employers risked losing this discount if their employees received treatment from doctors outside the PPN without sufficient justification.

Doctors were selected for inclusion in the PPN based on the recommendation of a "Medical Community Liaison" (MCL) working in each of SCIF's 18 district offices. Doctors interested in admission to the PPN submitted an application to the local MCL. The MCL was expected to familiarize himself or herself with the applicant's expertise and talents and "if at all possible, individually [meet] with the provider and . . . review[] with that provider the objectives of the [PPN] program." SCIF believed the MCL's recommendation was important because the MCL had "indispensible knowledge and information with regard to the physicians in their area." The MCL's had "the authority to make a recommendation" to SCIF about accepting applicants into the PPN, but did not make the final decision. If the MCL recommended a doctor for admission to the PPN, SCIF's claims rehabilitation department was

---

[1] In 2002, Labor Code former section 4600 provided a 30-day window in which an employer could direct an injured employee to a particular medical provider for treatment of an occupational injury: "After 30 days from the date the injury is reported, the employee may be treated by a physician of his or her own choice or at a facility of his or her own choice within a reasonable geographic area." (As amended by Stats. 1998, ch. 440.)

responsible for confirming the doctor's credentials. When that process was completed, the doctor entered into a contract with SCIF memorializing the provider's inclusion in the PPN. There was no appeals process by which to obtain review of an application if the MCL did not recommend admission.

SCIF's criteria for evaluating the "workers' compensation expertise of physicians for inclusion in the PPN" included, among other things, that the physician had "no restriction to practice, no sanctions or history of disciplinary action"; a "verifiable five-year history of malpractice awards and/or settlements that meets generally acceptable standards for the relevant specialty"; an "educational history that meets professionally recognized standards for the physician's area of practice"; and "no medical condition or other physical condition or problem that substantially impairs or prevents the essential functions of a physician." Physicians were also required to have "an awareness of the issues in workers' compensation [and] have significant experience in treating workers' compensation injuries . . . ." Physicians were required to "show evidence of expertise in the preparation and timely submission of treating physician reports," "have a work history of experience in workers' compensation that includes but is not limited to: writing rateable permanent disability reports, a demonstrated knowledge of the [workers' compensation] appeals process" and "have a history of cooperation with the practice, policy and philosophy of Early Return to Work efforts." The criteria also stated that the PPN would "limit the number of providers in any given geographic area."

In November 2004 SCIF began closing its PPN and no new members were nominated. The PPN was dissolved in April 2006 after SCIF created a new medical provider network (MPN), which was authorized under Labor Code section 4616 et seq., effective January 1, 2005. SCIF's MPN consists of former PPN providers and providers from a preexisting SCIF-Kaiser Permanente Alliance program, as well as providers selected by SCIF from the Blue Cross of California Preferred Provider Organization (PPO). New providers are added to the MPN "directly through the Blue Cross PPO, not the PPN, and [are] subject to credentialing by, and contracting with, the Blue Cross PPO."

*SCIF's market power in the Fresno area*

Because this appeal is from a judgment notwithstanding the verdict, we state the facts in the light most favorable to the jury verdict. (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 769 [117 Cal.Rptr.2d 574, 41 P.3d 575].)

SCIF is the largest workers' compensation insurance carrier in the State of California. Between 1998 and 2003, SCIF's share of the written premium

market in California grew from 22.36 percent to 53 percent. In 2003, the next largest insurer wrote only 5 percent of the market. By 2002, employers paying half of all SCIF written premiums were participating in the PPN program.

The market in the Fresno area for workers' compensation insurance was "reasonably consistent" with the statewide trends. Between 1998 and 2003, the Fresno district office, which includes four counties in the Central Valley, grew from writing approximately $62.1 million in annual premiums to writing approximately $516.6 million in premiums per year. According to Palm's salespeople, approximately six of every 10 businesses solicited in Fresno were insured by SCIF. In 2002, 61 percent of the total written premiums received by SCIF from insureds in Fresno County came from employers participating in the PPN program.

*Palm and its attempts to join the PPN*

In 1995, Dr. I. Frank Huljev established Palm and opened its occupational medical clinic in Fresno, California. At that time, Palm provided treatment for occupational injuries as well as back and neck injuries, home injuries, and sports injuries. The clinic also provided weight loss services and "DMV Physicals." In 1997, Palm relocated to a larger facility in northwest Fresno and began "developing more of the occupational medicine component of [its] practice." At the new clinic, Palm provides treatment for all aspects of occupational medicine, including onsite doctors, chiropractors, physical therapy, gym rehabilitation, medication, supplies and X-rays.

In 1998, Palm contacted Elisa Marie Moffitt, the MCL at SCIF's Fresno district office, regarding admission to the PPN. Moffitt toured Palm's clinic and met with members of Palm's medical staff. Ultimately, Moffitt wrote to Palm indicating that she would not recommend it for PPN admission because there was no geographic need for another network provider in northwest Fresno.

In 2001, Palm renewed its efforts to gain admission to SCIF's PPN. In response to Palm's request, Moffitt reviewed a number of SCIF's claims files in which employees were treated by Palm. In March 2002, Moffitt and her supervisor met with members of Palm's medical staff. Moffitt expressed a number of concerns about Palm's prior performance in the SCIF cases she had reviewed, including Palm's failure to comply with certain workers' compensation reporting requirements and in two instances the quality of Palm's medical treatment. Although Moffitt did not expressly refuse to recommend Palm for PPN admission, "due to the demeanor" of Moffitt and her supervisor, Palm "assumed that its application to participate [in the PPN program] would again be denied."

The following month, Palm's attorney wrote to the district manager of SCIF's Fresno office in "one additional attempt to become a member of the PPN." The letter explained that Palm had "sustained substantial losses due to the arbitrary and capricious behavior and acts of Ms. Moffitt" and that "[a] negative response [to that letter] would leave [Palm] with no choice but to sue for damages arising from [SCIF's] discriminatory, fraudulent, deceptive and unfair business practices."

In July 2002, SCIF informed Palm that it had "significant concerns with [Palm's] prior and current performance and [could not] consider them for admission into the PPN at [that] time."

*The litigation*

On July 1, 2003, Palm filed a complaint against SCIF, which as amended alleged causes of action for declaratory relief; violation of the fair procedure doctrine; interference with prospective economic advantage and unfair business practices. On November 28, 2005, following a month-long trial, a jury returned a special verdict in favor of Palm on its claim for violation of the fair procedure doctrine. The jury found that SCIF owed Palm a duty of fair procedure with respect to its application to the PPN because SCIF "possessed power so substantial over the market for the treatment of occupational injuries in the Fresno area in 2001–2002 that the failure to admit an ordinary, competent medical provider to its [PPN] would significantly impair that provider's ability to practice occupational medicine in the Fresno area." The jury also found that SCIF's reasons for rejecting Palm's application for admission to its PPN were arbitrary and unreasonable and that had fair procedures been provided, Palm should have been admitted into the PPN. The jury awarded Palm $1,131,000 in damages.[2]

---

[2] The special verdict form provided in full as follows: "Do you find by a preponderance of the evidence that State Compensation Insurance Fund's Preferred Provider Network possessed power so substantial over the market for the treatment of occupational injuries in the Fresno area in 2001–2002 that the failure to admit an ordinary, competent medical provider to its Preferred Provider Network would significantly impair that provider's ability to practice occupational medicine in the Fresno area?" The jury answered "Yes" and was directed to question number two which read, "With respect to Palm Medical Group's 2001–2002 application for admission to State Compensation Insurance Fund's Preferred Provider Network, do you find by a preponderance of the evidence that: [¶] (a) State Compensation Insurance Fund failed to provide Palm Medical Group with fair and adequate notice of the reason(s) for rejection of its application to the Preferred Provider Network, and a fair and reasonable opportunity to respond? [¶] . . . [¶] (b) State Compensation Insurance Fund's reasons for rejection of Palm Medical Group's application for admission to the Preferred Provider Network were arbitrary and unreasonable?" The jury answered "no" to subparagraph (a) and "yes" to subparagraph (b), and was directed to question number three which read, "Do you find by a preponderance of the evidence that if fair procedures had been provided by State

SCIF filed a motion to set aside the judgment and to have judgment entered in its favor notwithstanding the jury's verdict. SCIF argued, among other things, that the evidence received at trial was insufficient to support the finding that SCIF possessed "substantial power" in the Fresno area or that "any significant impairment" to Palm's ability to practice occupational medicine resulted from Palm's failure to gain PPN admission. The trial court agreed, explaining "There is no substantial evidence that [SCIF's PPN] possessed power so substantial over the market for the treatment of occupational injuries in the Fresno area in 2001–2002 that the failure to admit [Palm] to its [PPN] significantly impaired [Palm's] ability to practice occupational medicine in the Fresno area." The court vacated its prior judgment and entered a new judgment in SCIF's favor. Palm filed a timely notice of appeal. Thereafter, SCIF filed a timely notice of cross-appeal.

## DISCUSSION

### 1. The common law right to fair procedure

■ The common law doctrine of fair procedure protects against arbitrary decisions by private organizations under certain circumstances. (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1066 [95 Cal.Rptr.2d 496, 997 P.2d 1153] (*Potvin*).) When the doctrine applies, private entities may not expel or exclude qualified persons without acting in a manner that is substantively rational and procedurally fair. (*Id.* at pp. 1066–1072.) The doctrine applies primarily to decisions affecting membership in private organizations that affect the public interest (*id.* at p. 1070), particularly when there are "substantial economic ramifications" from exclusion (*Ezekial v. Winkley* (1977) 20 Cal.3d 267, 272 [142 Cal.Rptr. 418, 572 P.2d 32] (*Ezekial*)). The doctrine, recognized in California since the late 19th century, has evolved through a series of cases summarized and most recently reaffirmed in *Potvin*. (*Potvin, supra,* at pp. 1063–1064, 1066–1071 [doctrine has been applied to labor unions that exercise a monopoly over the supply of labor; professional associations that determine the standards for the practice of the profession; managed care organizations that hold substantial economic power over physicians and their patients].) ■ In *Potvin*, which involved a physician's claim that he had been removed from an insurance company's preferred provider list in violation of his right to fair procedure, the court explained that "when an insurance company with fiduciary obligations to its insureds maintains a list of preferred provider physicians to render medical

Compensation Insurance Fund in connection with Palm Medical Group's 2001–2002 application for admission to State Compensation Insurance Fund's Preferred Provider Network, that Palm Medical Group should have been admitted into the Preferred Provider Network?" The jury answered "yes" and was directed to the final question, "What is the amount, if any, of Palm Medical Group's damages," to which it responded "$1,131,000."

services to the insureds, a significant public interest is affected." (*Id.* at p. 1070.) But the fact that "the relationship between insurers and their preferred provider physicians significantly affects the public interest does not necessarily mean that every insurer wishing to remove a doctor from one of its preferred provider lists must comply with the common law right to fair procedure. The obligation to do so arises only when the insurer possesses power so substantial that the removal significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest." (*Id.* at p. 1071.)

Based on selective quotations from the opinion in *Potvin,* SCIF argues that the decision "expressly limited its holding to [PPN] removal decisions," as distinguished from decisions to exclude an individual who has never gained admission. SCIF quotes from the *Potvin* opinion a statement originating in *Ezekial*: " 'The underlying theme of these decisions, variously stated, is that membership in an association, with its associated privileges, *once attained*, is a valuable interest which cannot be arbitrarily withdrawn. Thus, they comport with the broader principle that *one on whom an important benefit or privilege has already been conferred may enjoy legal protections not available to an initial applicant for the same benefit.*' " (*Potvin, supra,* 22 Cal.4th at p. 1069, quoting *Ezekial, supra,* 20 Cal.3d at p. 273, italics added.)

The full paragraph from which the quotation cited by SCIF was taken, however, indicates that the principles on which this line of cases[3] rests are "invoked primarily against arbitrary *exclusions* from membership in private associations." (*Ezekial, supra,* 20 Cal.3d at p. 272; see *Potvin, supra,* 22 Cal.4th at p. 1069.) The paragraph explains that in earlier cases the principles had been applied to expulsions and, in the portion SCIF quotes, applied even to expulsion from "fraternal and social groups," which presumably do not have the same effect on the public interest. (*Ezekial, supra,* at pp. 272–273; see *Potvin, supra,* at p. 1069.) Neither in *Potvin* nor in any other case has the court indicated that the fair procedure doctrine does not apply to the refusal to admit an individual to a group that impacts the public interest.

---

[3] *Ezekial* referred to these principles as the "*Marinship-Pinsker* principles," based on the decisions in *James v. Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329] (*Marinship*), *Pinsker v. Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160 [81 Cal.Rptr. 623, 460 P.2d 495] (*Pinsker I*), and *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541 [116 Cal.Rptr. 245, 526 P.2d 253] (*Pinsker II*). (*Ezekial, supra,* 20 Cal.3d at pp. 271–272.) *Potvin,* in turn, referred to the "*Marinship-Pinsker-Ezekial* cases." (*Potvin, supra,* 22 Cal.4th at p. 1071.)

■ In *Pinsker II,* our Supreme Court cited to a "seminal decision" of the New Jersey Supreme Court[4] for the explanation "that the common law principle of judicial review of expulsions from membership associations had developed, in more recent years, to encompass a comparable judicial scrutiny of *exclusions* from membership in a special, limited category of private associations such as labor unions or professional and trade associations. Because of their monopolistic position in a given field of employment, such organizations wield enormous power, and for an individual seeking to make a living in a given trade or profession, membership in such organizations is frequently 'an economic necessity.' " (*Pinsker II, supra,* 12 Cal.3d at pp. 550–551.) Many of the California decisions leading to *Potvin* arose from exclusions, as distinguished from expulsions, from membership. (*Marinship, supra,* 25 Cal.2d 721; *Pinsker I, supra,* 1 Cal.3d 160; *Pinsker II, supra,* 12 Cal.3d 541; *Kronen v. Pacific Coast Society of Orthodontists* (1965) 237 Cal.App.2d 289, 302–305 [46 Cal.Rptr. 808], cert. den. (1966) 384 U.S. 905 [16 L.Ed.2d 358, 86 S.Ct. 1340]; *Ascherman v. Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 512 [119 Cal.Rptr. 507]; *Ascherman v. San Francisco Medical Society* (1974) 39 Cal.App.3d 623 [114 Cal.Rptr. 681].) Thus, contrary to SCIF's argument, the doctrine applies where exclusion, in the case of the medical profession, "significantly impairs the ability of an ordinary, competent physician to practice medicine or a medical specialty in a particular geographic area, thereby affecting an important, substantial economic interest." (*Potvin, supra,* 22 Cal.4th at p. 1071.)

■ The right to fair procedure extends to a medical corporation as well as to an individual physician. SCIF's suggestion that it had no duty to afford fair procedure to Palm because Palm is a corporation rather than an individual physician is also based on an overly narrow reading of the relevant case law. SCIF quotes from a footnote in *Potvin* in which the court explained that its decision "does not apply to employer-employee contractual relations. Rather, it applies only to an insurer's decision to remove *individual physicians* from its preferred provider lists." (*Potvin, supra,* 22 Cal.4th at p. 1071, fn. 2, italics added; see also *Ezekial, supra,* 20 Cal.3d at p. 279 [right of fair procedure is afforded to an "adversely affected individual"]; *Pinsker II, supra,* 12 Cal.3d at p. 555 ["a basic ingredient of the 'fair procedure' required under the common law is that an individual who will be adversely affected by a decision be afforded some meaningful opportunity to be heard in his defense"].) Neither *Potvin* nor the other authorities cited, however, considered whether the doctrine of fair procedure applies to a private medical corporation. No court has ever drawn the distinction SCIF urges.

The United States Supreme Court has long recognized that "[u]nder the designation of person there is no doubt that a private corporation is included.

---

[4] *Falcone v. Middlesex Co. Medical Soc.* (1961) 34 N.J. 582 [170 A.2d 791].

Such corporations are merely associations of individuals united for a special purpose, and permitted to do business under a particular name . . . ." (*Pembina Mining Co. v. Pennsylvania* (1888) 125 U.S. 181, 189 [31 L.Ed. 650, 8 S.Ct. 737].) Numerous courts have recognized that a corporation has a fundamental right to procedural due process. (See, e.g., *Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 707–709 [99 Cal.Rptr.2d 917]; *Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1087 [44 Cal.Rptr.2d 472].) We see no valid reason to deny corporations similar protection under the doctrine of fair procedure. (*Golden Day Schools, Inc. v. State Dept. of Education, supra,* at p. 708 ["the distinction in the fair procedure and due process rights involved appears to be one of origin rather than the protection afforded"].)

## 2. *Substantial evidence supports the jury's verdict*

*SCIF's market power*

■ At trial, Palm argued that SCIF owed it a duty to afford fair procedure in evaluating its application for admission to SCIF's PPN. By stipulation, the jury was properly instructed as follows: "To establish that [SCIF] had a duty to afford it fair procedure, [Palm] must prove by a preponderance of the evidence that [SCIF's PPN] possesses power so substantial over the market for the treatment of occupational injuries in the Fresno area, that failure to admit an ordinary, competent medical provider to its [PPN] would significantly impair that provider's ability to practice occupational medicine in the Fresno area." As noted above, the jury found that SCIF owed Palm such a duty. The trial court granted SCIF's motion for judgment notwithstanding the verdict on the ground that the evidence did not support the jury's finding.

"The trial court may grant judgment notwithstanding the verdict only if the verdict is not supported by substantial evidence. The court may not weigh evidence, draw inferences contrary to the verdict, or assess the credibility of witnesses. The court must deny the motion if there is any substantial evidence to support the verdict. [Citations.] This court therefore may uphold the order granting judgment notwithstanding the verdict, and affirm the judgment based thereon only if, reviewing all the evidence in the light most favorable to [Palm], resolving all conflicts, and drawing all inferences in [its] favor, and deferring to the implicit credibility determinations of the trier of fact, there was no substantial evidence to support the jury's verdict in [its] favor. 'If the evidence is conflicting or if several reasonable inferences may be drawn,' the court erred in granting the motion and we must reverse." (*Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 72–73 [92 Cal.Rptr.2d 611].)

In determining whether a private association or organization is required to provide fair procedure before rejecting an application for membership, the judicial inquiry is "focused on the practical power of the entity in question to affect substantially an important economic interest." (*Ezekial, supra*, 20 Cal.3d at p. 277.) The entity need not "have monopolistic control over the plaintiff's right to practice his profession" (*Ascherman v. San Francisco Medical Society, supra*, 39 Cal.App.3d at p. 650) and the plaintiff need not establish a complete termination of his right to practice his profession (*Potvin, supra*, 22 Cal.4th at p. 1071). The duty to comply with the common law right to fair procedure arises if the entity possesses sufficient market power that exclusion significantly impairs the practice of the applicant's profession or affects a substantial economic interest. (*Ibid.*; see also *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 658 [163 Cal.Rptr. 831] ["The hospital's action did not completely eliminate plaintiff's staff privileges or remove him from staff membership. There is no indication in the record that his use of hospital facilities other than those in the obstetrical department was affected by the investigation and adjudication. Since plaintiff testified that about 40 percent of his income was derived from his obstetrical practice, his interest in obstetrical privileges was substantial and we do not find that a partial exclusion of this magnitude merits any less procedural protection than revocation of full staff membership."].)

Here, the undisputed evidence established that SCIF is the largest workers' compensation insurer in both the state and in the Fresno area. More than half of all employers in Fresno are insured by SCIF, and more than half of SCIF's premiums in Fresno County are derived from policies issued to PPN program members. As Palm argues, "if SCIF writes over half of the Fresno market, and over 60% of that is in the PPN, then over 30% of the entire Fresno workers compensation market is in SCIF's PPN, and is by definition unavailable to Palm." (Underscoring omitted.) Palm's salespeople confirmed that they were generally unable to solicit business from any SCIF-insured business because Palm was not included in the PPN.

Palm also presented evidence that its exclusion from the PPN interfered with its non-SCIF business relationships and its ability to attract new non-SCIF business. Huljev testified that two state agencies, Caltrans (California's Department of Transportation) and the California Highway Patrol, ceased doing business with Palm because it was not on "the list." The personnel administrator for the San Joaquin Valley Air Pollution Control District testified that although she was satisfied with Palm's services, her agency stopped doing business with Palm because it was not a PPN provider. Other existing clients also stopped using Palm's services when they became insured by SCIF.

Palm presented evidence that while its annual gross revenue increased between 1997 and 2001 from approximately $860,000 to $1.3 million, its revenues decreased steadily thereafter and in 2005 were projected to be only $750,000. Palm's expert testified that in light of the expansion of the market in Fresno for occupational medicine, Palm's growth in the early years "was terrible." This evidence is sufficient to establish the substantial power of SCIF's PPN in the Fresno market. (See *Delta Dental Plan v. Banasky* (1994) 27 Cal.App.4th 1598, 1607 [33 Cal.Rptr.2d 381] ["Delta controls an important economic interest as the largest dental health plan in California, covering over 8,000,000 individuals."]; *Ascherman v. San Francisco Medical Society, supra,* 39 Cal.App.3d at p. 650 [misconduct of four hospitals out of the "many hospitals in the San Francisco Bay Area" may be significant enough to significantly affect plaintiff's economic interests]; *Ambrosino v. Metropolitan Life Ins. Co.* (N.D.Cal. 1995) 899 F.Supp. 438, 445 [defendant "control[led] substantial economic interests" affecting plaintiff where about 15 percent of plaintiff's patients were insured by defendant].)

SCIF's arguments in support of the judgment notwithstanding the verdict are not persuasive. First, SCIF contends that Palm's reliance on the written premium statistics is misleading and distorts the true market power of SCIF and its PPN. SCIF argues that when the data is properly analyzed, as of 2002 it controlled on a statewide basis only 31 percent of the total workers' compensation market and that SCIF PPN policyholders accounted for only 16 percent of the statewide workers' compensation market. Even if these figures are correct, this argument incorrectly assumes that 31 percent of the total market, or even 16 percent, as a matter of law is not significant enough to support the finding that SCIF possessed substantial market power. However, the inability to compete for patients in 16 to 31 percent of the market is not necessarily insignificant. (See, e.g., *Applebaum v. Board of Directors, supra,* 104 Cal.App.3d at p. 658; *Ambrosino v. Metropolitan Life Ins. Co., supra,* 899 F.Supp. at p. 445.) To the contrary, Palm's evidence supports the conclusion that SCIF's share of the market was such that Palm's inability to access patients covered by SCIF policies issued to members of its PPN had a significant impact on its profitability.

SCIF suggests that within Fresno, "the vast majority of [its] policyholders did not participate in the PPN." (Italics omitted.) SCIF notes that "of the approximately 10,000 policies written by [SCIF] in Fresno County in 2002, only approximately 2,100 [or 21 percent] participated in either PPN or Kaiser programs." Again, SCIF's argument is premised on the incorrect assumption that exclusion from 20 percent of the market is necessarily insignificant. More importantly, SCIF's statistic that only 20 percent of Fresno employers participated in either the PPN or Kaiser programs is misleading. Palm offered evidence that companies participating in the PPN program typically were the larger employers. While only 20 percent of employers participated in these

programs, the percentage of employees covered by the programs was higher. For that reason, Palm argued to the jury that the percentage of written premiums on policies issued to participants in the PPN program (61 percent of SCIF's total premiums received in Fresno County, or 30 percent of the total workers' compensation premiums paid in Fresno County) more accurately represented the market power of SCIF's PPN. The jury reasonably credited Palm's evidence.

SCIF argues that without admission to the PPN, Palm was nonetheless free to compete to provide services to SCIF's non-PPN employees and to employees of companies insured by carriers other than SCIF, persons working for self-insured companies, and persons working for governmental agencies. This argument, however, ignores Palm's evidence demonstrating that SCIF steered its non-PPN policyholders to PPN providers. Palm presented evidence that SCIF's online computer program for locating medical providers refers inquiring employers only to PPN providers. Even non-PPN policyholders would be referred only to PPN providers if they used the online tool to locate a provider. Palm also presented evidence that many state government agencies use SCIF as an adjuster on their workers' compensation claims and that by contract with SCIF are required to use its PPN providers.

SCIF also argues that despite the PPN's market share, "[n]early 80 [percent] of all [SCIF's] medical payments in Fresno went to non-PPN providers such as Palm." SCIF's expert acknowledged, however, that included in the 80 percent figure are all SCIF payments to hospitals and nursing homes, as well as to providers of other services not provided by Palm. Moreover, the fact that Palm was able to compete for a portion of the market does not necessarily establish that its exclusion from the PPN was insignificant.

Finally, SCIF argues that Palm's exclusion from the PPN did not significantly impair its ability to practice occupational medicine in Fresno. SCIF relies on evidence that Palm's gross revenue increased between 1997 and 2002 and that the number of injured employees treated by Palm also grew from 35 to 577 in the same time period. Palm, however, offered evidence that its growth was the product of "aggressive marketing to the community and cost-cutting within the clinic" and that even with those efforts, the results were "terrible" when viewed in the context of the overall market. Huljev testified that despite an increase in gross revenue through 2001, the clinic was never profitable. In 2002, after Palm was for the second time excluded from the PPN, its revenue decreased significantly.[5] Huljev testified that he had not

---

[5] Notably, in 2002 SCIF crossed the 50 percent mark for written premiums in California. For the years between 1998 and 2000, while Palm was experiencing some growth, SCIF was writing only between 22 and 27 percent of the premiums in California.

taken a paycheck from the clinic since October 2004 and that both of his salespeople quit because their ability to earn a living was negatively impacted by their inability to compete within SCIF's share of the market. Huljev opined that if Palm was not admitted to the PPN, it could no longer sustain itself and would be forced to close its clinic.

■ Thus, the trial court erred in granting SCIF's motion for judgment notwithstanding the verdict. It is undisputed that the jury was properly instructed on the standard to be applied in determining whether SCIF owed Palm a duty of fair procedure. Over the course of a four-week trial, the jury heard extensive conflicting evidence as to the extent of SCIF's market power in the Fresno area and the impact upon Palm's ability to engage in the practice of occupational medicine in that area if excluded from SCIF's PPN. While SCIF presented evidence that might have supported contrary findings, the jury found in Palm's favor. Substantial evidence unquestionably supports the jury's finding.

### Substantively fair procedure

Having concluded that the trial court erred in granting judgment notwithstanding the verdict, we address SCIF's protective cross-appeal, in which SCIF argues substantial evidence does not support another finding of the jury, that Palm was not afforded fair procedure. The assertion of this issue does not require a cross-appeal and is more appropriately presented as an alternative argument as to why the judgment should be affirmed. (*Furia v. Helm* (2003) 111 Cal.App.4th 945, 948, fn. 2 [4 Cal.Rptr.3d 357].) In all events, we address the issue on its merits.

■ As indicated above, the common law doctrine of fair procedure has both a substantive and procedural component. The decision must be substantively rational. (*Potvin, supra,* 22 Cal.4th at p. 1072, citing *Pinsker II, supra,* 12 Cal.3d at p. 550.) A decision violates this requirement when it is arbitrary, capricious, discriminatory, irrational or contrary to public policy. (*Pinsker II, supra,* 12 Cal.3d at p. 553; *Gill v. Mercy Hospital* (1988) 199 Cal.App.3d 889, 897 [245 Cal.Rptr. 304]; *Marinship, supra,* 25 Cal.2d at pp. 736–737.) The decision also must be reached in a manner that is procedurally fair. (*Potvin, supra,* at p. 1072, citing *Pinsker II, supra,* at p. 550.) At a minimum, procedural fairness requires notice and an opportunity to be heard. (*Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 741 [30 Cal.Rptr.3d 230].) Consistent with this authority, the jury was instructed that to establish that SCIF breached the duty of fair procedure, it must find "One, [SCIF] did not provide [Palm] with a fair and adequate notice of the reasons for rejection of its application for admission to the [PPN] and a fair and reasonable opportunity to respond, or; Two, [SCIF's] reasons for rejecting

[Palm's] application for admission to the PPN were arbitrary and unreasonable." The jury did not find in Palm's favor with regard to procedural fairness, but did find that SCIF breached its duty with regard to substantive fairness.

SCIF argues that the evidence "showed that [SCIF] had an 'array of legitimate concerns' relating to Palm's performance and a number of different reasons that formed the basis for the decision not to admit Palm to the PPN in 2002." SCIF offers seven reasons for Palm's exclusion and argues that "virtually *any one* of the reasons . . . separately supported [SCIF's] decision denying Palm PPN admission." We consider in turn the evidence in support of each reason.

SCIF offers as its first and third reasons for excluding Palm from the PPN that Palm allegedly failed to comply with mandatory workers' compensation reporting requirements for primary treating physicians in workers' compensation cases. SCIF contends that Palm failed to comply with California Code of Regulations, title 8, section 9785, subdivision (f). This regulation provides that progress reports "shall be submitted on the 'Primary Treating Physician's Progress Report' form (Form PR-2) contained in Section 9785.2, or in the form of a narrative report. If a narrative report is used, it must be entitled 'Primary Treating Physician's Progress Report' in bold-faced type, must indicate clearly the reason the report is being submitted, and must contain the same information using the same subject headings in the same order as Form PR-2. . . . [¶] By mutual agreement between the physician and the claims administrator, the physician may make reports in any manner and form." (*Id.,* subd. (f)(8).) Consistent with the regulation, the PR-2 form (Primary Treating Physicians Progress Report) states that "The information below must be provided. You may use this form or you may substitute or append a narrative report."[6] Palm presented evidence that it did not use the PR-2 form because that form could be completed only by typewriter. Instead, Palm—like many other providers—used a narrative report that could be generated by computer. Palm also presented evidence that it had used the narrative report in many SCIF cases and that prior to its request for admission, SCIF had never questioned its use of that form. While SCIF may be correct that "refusing to follow the network's rules and regulations *alone* would be reason to refuse membership to a provider," there is no evidence that Palm refused to follow the rules. The jury could reasonably conclude that SCIF's reliance on this reason was arbitrary and unreasonable.

SCIF's second justification for Palm's exclusion was that in some prior cases Palm failed to sign its medical reports. Moffitt testified that during her

---

[6] SCIF asserts that Palm's failure to use the form PR-2 was a failure to comply with both the state regulation (reason 1) and the PPN rules and regulations (reason 3). The analysis is the same under either theory.

review of Palm's performance in SCIF cases she found "several" medical reports that were not signed by Palm's medical providers.[7] She explained that this was problematic for SCIF because unsigned medical reports cannot be used as evidence in workers' compensation appeals. However, Huljev testified that prior to 2002 no SCIF adjuster had complained about the lack of a signed report. He also explained that the unsigned reports were the result of the clinic's new electronic document storage system, which could not easily store signatures electronically. As a result, when SCIF requested the same report more than once, the signatures were not attached to the duplicate reports. Huljev testified that he had explained this problem to Moffitt at their meeting and assured her that he would correct it. Contrary to SCIF's argument, Palm's electronic difficulties do not establish that Palm was unfamiliar with the workers' compensation appeals process. The jury was fully justified in finding this reason to be arbitrary and unreasonable.

SCIF's fourth reason was that Palm did not employ a full-time physician. In 2001 and 2002, Palm's physician worked three days a week and patients were also treated under her supervision by a physician's assistant. The physician's assistant testified that he is licensed to perform most of the services that a doctor can provide and is authorized under the workers' compensation statutes to be on call for after-hour injuries, to conduct initial examinations and to order up to three days of temporary disability. Palm also presented testimony of a local personnel administrator that it is a "standard practice at industrial medical clinics for nurse practitioners or physician's assistants to see patients." SCIF did not explain at trial, nor has it explained in its appellate briefs, the basis for its objection to Palm's use of a physician's assistant when such use is common and authorized under the workers' compensation law. The jury reasonably rejected this reason as arbitrary or irrational.

SCIF's fifth and sixth reasons involve Palm's treatment of two former patients. In the first instance, an employee sent to Palm for a preemployment physical examination was cleared to work as a ski instructor "without restriction" despite a prior knee injury, and the worker later suffered an occupational injury. In the second case, Palm and a patient disagreed about whether Palm's treatment was improving the patient's condition, and after the patient began seeing a different medical provider he was diagnosed with cancer. Palm presented evidence that its treatment was reasonable in both instances. Palm detected the preexisting knee injury during the preemployment examination and advised the employer of the injury in writing. Moreover, following the ski instructor's occupational injury, an SCIF-approved

---

[7] SCIF also relies on trial testimony by Palm's chief physician in which she allegedly "admitted that she not only failed to sign medical reports, but that she often did not read them after they had been finalized by Palm's administrative staff." SCIF's quotation entirely mischaracterizes the witness's testimony.

provider released the employee to return to work without having performed surgery and again with no restrictions. With regard to the second incident, the evidence showed that the man was a patient of the clinic for less than one month and that his second provider prescribed the same treatment that Palm had administered for his occupational injury.

SCIF does not dispute Palm's evidence, but argues that it was entitled to reject Palm's application based on a showing that "it had a legitimate concern regarding the quality of care rendered by Palm and that such concern was a reasonable factor to rely upon in considering whether Palm would be named to a panel of preferred providers." (Italics omitted.) While the quality of care provided by an applicant undoubtedly is an appropriate basis on which to consider a provider's application, the evidence before the jury supports the implicit finding that SCIF's concerns about Palm's quality of care were neither genuine nor legitimate.

The final justification offered by SCIF for its refusal to admit Palm to its PPN was that there was no need for another provider in "northwest Fresno." SCIF acknowledges that it admitted another provider to the PPN in the same area in 2001, but explains that "it did so because of a need for expertise in treating burn cases." Assuming, without deciding, that this could be an acceptable justification for rejecting an applicant, SCIF did not present any evidence to support this justification. In the absence of evidence establishing that there was sufficient coverage in the Fresno area, the jury was entitled to find that this excuse too was pretextual and arbitrary.

3. *The jury properly awarded Palm $1,131,000 in damages*

The jury awarded Palm $1,131,000 in damages. SCIF argues that the award must be reversed because damages are not a remedy for violating the fair procedure doctrine. Quoting *Pinsker II, supra,* 12 Cal.3d at page 557, SCIF asserts that the only available remedy "is a remand to the organization to 'reconsider [its prior decision] pursuant to a fair procedure.'" SCIF's assertion finds no support in *Pinsker II,* on which SCIF relies. In that case the plaintiff did not seek damages. The trial court there denied a requested injunction to compel orthodontic societies to admit a dentist. In reversing because the societies had not afforded the dentist an opportunity to respond to the charges against him, the Supreme Court held that it was not for the court to make that determination, since "the trial judge possessed neither the professional expertise nor the discretionary latitude of such associations, and consequently his decision is not an adequate substitute for a determination by such bodies." (*Id.* at p. 557.) The Supreme Court therefore directed that an injunction be granted ordering the societies to reconsider the dentist's application pursuant to a fair procedure. (*Id.* at pp. 557, 561.) Nothing in

*Pinsker II* addresses or limits the availability of damages in an action for a violation of the fair procedure doctrine.

█ In contrast, in *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 478 [131 Cal.Rptr. 90, 551 P.2d 410], the court held that tort damages are available for the failure to provide fair procedure. The court explained, "When a hospital denies staff privileges to a doctor without affording him the basic procedural protection to which he is legally entitled, the hospital and parties acting in concert with the hospital can offer no convincing reason or justification why they should be insulated from an immediate tort suit for damages." (*Ibid.*; see also *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 103–104 [26 Cal.Rptr.3d 744] [damages are available in action for violation of fair procedure, but rules requiring exhaustion of administrative remedies apply].)

In *Palmer v. Regents of University of California* (2003) 107 Cal.App.4th 899, 905 [132 Cal.Rptr.2d 567], the court set forth the important policy considerations supporting the exhaustion requirement: " '[A]n exhaustion of remedies requirement serves the salutary function of eliminating or mitigating damages. If an organization is given the opportunity quickly to determine through the operation of its internal procedures that it has committed error, it may be able to minimize, and sometimes eliminate, any monetary injury to the plaintiff by immediately reversing its initial decision and affording the aggrieved party all membership rights; an individual should not be permitted to increase damages by foregoing available internal remedies. [Citation.] [¶] Moreover, by insisting upon exhaustion even in these circumstances [where the plaintiff is seeking only damages and not reinstatement], courts accord recognition to the "expertise" of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance.' " (Quoting *Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d at p. 476.) Relying on *Palmer v. Regents of University of California* and *Kaiser Foundation Hospitals v. Superior Court, supra,* 128 Cal.App.4th 85, SCIF argues belatedly in its reply brief that Palm failed to present evidence that it exhausted or was excused from exhausting its administrative remedies. However, as SCIF's own witness testified, SCIF had no formal administrative review process if the MCL decided not to recommend an application for admission to the PPN. SCIF's suggestion that Palm could have asked to speak with Moffitt's superiors or "[a]s time passed, . . . taken [SCIF] up on its promise to reconsider in light of any new information" was hardly sufficient to impose a condition to the filing of this action. Moreover, SCIF's suggestion that Palm improperly delayed filing suit to increase its damages is both unsupported and irrelevant to whether Palm exhausted its administrative remedies.

Finally, the jury's award was not speculative. SCIF argues that "Palm's lost profit damages claim is premised on the [unsupported] assumption that had Palm been afforded 'fair procedure' in connection with its attempt to gain PPN admission, it would have been admitted." (Italics omitted.) The jury found, however, that if Palm had been afforded fair procedure it should have been admitted to the PPN. In so finding, the jury necessarily considered and rejected each of SCIF's allegedly "ample, substantively rational reasons not to admit Palm into the PPN" (italics omitted) and, as discussed above, substantial evidence supports the jury's finding.

SCIF argues that "Palm failed to present substantial evidence that its failure to gain PPN admission caused it to lose profits." Palm's expert witness, Gary Capata, a certified public accountant, testified that Palm lost between $2.6 and $3.3 million in profits as a result of its exclusion from the PPN. Capata estimated Palm's gross revenue if it had been admitted to the PPN by utilizing the average gross revenue of the top four or six PPN providers in Fresno. Based on evidence that Palm's per claim revenue was twice that of the other providers because Palm offered more services at its clinic, including physical therapy and chiropractic services, he estimated that Palm would have provided about one-third more services per year than the average number of services provided by those other providers and added 50 percent to estimate Palm's total gross revenue. From this number, Capata subtracted Palm's expenses, which he estimated would have increased by 50 percent with the additional clientele. The estimated 50 percent increase in expenses was based in part on the testimony of an expert medical administrator, Robert Johnson, that Palm had the capacity to double its volume of patients without making significant changes to its business structure. Capata explained that his opinion was based on his review of, among other things, Palm's tax returns, income statements, general ledgers and cancelled checks, evidence produced by SCIF in discovery, and publicly available financial information concerning one of Palm's competitors.

SCIF's criticism of Capata's methodology did not require the jury to reject his opinion. SCIF argues that Capata's opinion was speculative because "he failed to account for any of the other potential reasons why Palm failed to meet its income expectations." (Italics omitted.) SCIF offered testimony by its expert that "there are a host of factors [such as location or reputation] that can affect the ability of an occupational medicine clinic to attract business," but SCIF did not offer any evidence that any particular factor would have negatively impacted Capata's estimates or was even applicable in the present case. SCIF also argues that Capata's comparison of Palm to other providers was flawed because he did not have enough information about the identity and practices or the other providers. The identity of the top PPN provider was known, and Capata testified that this provider offered services comparable to Palm's services and that Palm had the capacity to serve a similar volume of

patients. The data concerning the other top providers was derived in large part from SCIF's documentation which concealed their identity. Nonetheless, Capata was able to compare Palm's per claim revenue to that of the other providers and satisfy himself that the average revenue numbers he used were sound. The jury award of $1,131,000, significantly less than Capata's "conservative" estimate of $2.6 million, likely reflected some of SCIF's criticism. In all events, the award is substantially supported by the expert testimony of Palm's witnesses.

## 4. *Palm was not entitled to an injunction compelling its admission to the PPN*

On March 2, 2006, prior to granting SCIF's motion for judgment notwithstanding the verdict, the court denied Palm's request under Business and Professions Code section 17203 for an injunction requiring SCIF to admit Palm to its PPN. Business and Professions Code section 17203 provides in relevant part, "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use . . . of any practice which constitutes unfair competition, as defined in this chapter . . . ." Palm argues that the trial court abused its discretion in denying its request for injunctive relief.

In March 2006, when the injunction was being considered, SCIF had almost completed the transition of its coordinated care program from use of the PPN to the MPN. (See p. 212, *ante.*) That transition has now been completed and the MPN is subject to new and different statutory requirements. (Lab. Code, § 4616.)[8] While Palm may be correct that admission to the PPN would have made it "easier to switch over into SCIF's new network," the trial court did not abuse its discretion in refusing to grant an injunction. In a declaration submitted by SCIF in opposition to Palm's application for an injunction, SCIF's medical network manager stated that in January 2006, she informed Dr. Huljev that he and Palm's medical doctor, Dr. Regina Shay, "had been nominated for admission into the MPN pending credentialing and contracting by Blue Cross PPO." Thus, the need for prospective relief was at that point highly uncertain. Moreover, the court should not properly decide in the first instance whether Palm should be admitted to the new network. (*Pinsker II, supra*, 12 Cal.3d at p. 557.) Hence, injunctive relief was properly denied.

---

[8] Arguments have been submitted by several amici curiae urging that the fair procedure doctrine should not apply to decisions for admission to a medical provider network authorized under newly enacted Labor Code section 4616, such as SCIF's new MPN. We do not address whether provisions included in section 4616 affect any of the conclusions reached in this opinion.

## DISPOSITION

The judgment entered pursuant to the order granting judgment notwithstanding the verdict is reversed, and the trial court shall enter judgment for Palm in accordance with the jury verdict. Palm is to recover its costs on appeal.

McGuiness, P. J., and Horner, J.,* concurred.

The petition of appellant State Compensation Insurance Fund for review by the Supreme Court was denied June 18, 2008, S163235. George, C. J., Werdegar, J., and Corrigan, J., did not participate therein.

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.