Filed 12/15/15  Patel v. Touro University CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ANIMESH PATEL,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>TOURO UNIVERSTIY,<br><br>　　　Defendant and Respondent. | A140764<br><br>(Solano County<br>Super. Ct. No. FCS41817) |

Animesh Patel appeals from the denial of his petition for administrative mandate seeking reinstatement as a student at Touro University (Touro), a private nonprofit university in Vallejo.  (Code Civ. Proc., § 1094.5.)  He had been a student in Touro's College of Osteopathic Medicine (TUCOM) and was dismissed for stalking a female professor and other troubling personal interactions reported by students, staff and faculty, which seemed to point to mental instability on Patel's part.  Patel claims his dismissal violated TUCOM's own Student Handbook (Handbook)—and thereby violated due process—based on both the committee's composition and its failure to accord him sufficient notice and a right of confrontation.  The superior court denied his petition and rendered judgment in favor of Touro.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In August 2012 Patel was a second-year graduate student at TUCOM.  He had exhibited some antagonistic interpersonal behaviors in his first year in the program.  In August 2011, Dr. Yasmin Nibbe, a female TUCOM faculty member reported that Patel reacted angrily at a school event, railing against America, calling Americans racist, and

1

intensely criticizing TUCOM's handling of diversity issues. A fellow student registered a similar complaint. The administration warned Patel that continued provocative conduct could result in a meeting with the Student Professionalism Committee (Professionalism Committee).[1]

At the beginning of his second year things only got worse. In mid-August 2012, Senior Associate Dean, Dr. Abraham Pera, a TUCOM faculty member and Chair of the Professionalism Committee, received complaints from a faculty member and two students about Patel's erratic and seemingly threatening behavior. Dr. Nibbe reported that Patel went into a tirade in her office, complaining that no one cares about anyone else in this country, airing his problems with other students, ranting about politics, and finally, expressing his distrust of men. One student reported Patel had often expressed hatred for Dr. Nibbe and lust for another female faculty member, Dr. Nathalie Garcia-Russell. Patel was convinced Dr. Garcia-Russell returned his sexual interest. Patel also had warned of the approaching "end of days" and his belief that America would be left a barren wasteland. The second student reported similar disturbing communications from Patel, including a text message saying, "Dark Knight Rises" (which the student understood as a reference to the then-recent movie theater shooting in Aurora, Colorado). Patel also texted, "If you think 2012 was bad for the world, brace yourself for 2013." Both students requested anonymity out of concern for their personal safety.

When he received these reports, Dr. Pera called Patel into a meeting with Dr. James Binkerd, Interim Dean of Student Services, and Ron Bauer, Director of Counseling and Coaching, to determine if he posed a safety risk to himself or others. The administrators arranged for Patel to have a psychiatric examination three days later with a male psychiatrist. Patel complied but later complained he did not trust the psychiatrist because he was a man. Dr. Pera met with Patel the day after the scheduled psychiatric

---

[1] TUCOM's Professionalism Committee addresses complaints of student conduct in violation of the professionalism standards outlined in the Handbook, investigates such complaints, and makes recommendations to the Dean for appropriate action, which may include student discipline.

2

examination. Patel claimed to be the victim of prejudice and "proceeded to express a flight of ideas" which Dr. Pera found "bizarre and disjointed."

The following day, August 21, 2012, Patel was called into a meeting with Dr. Pera and two other members of the Professionalism Committee and was asked about the reported incidents. It is not clear how much the committee revealed about the contents of the complaints. When questioned about the concerns of other students and faculty, Patel changed the subject to health care and politics, his recent travels, and contrasts between the United States and Europe. The committee members told Patel his conduct violated TUCOM's professionalism standards, and he was warned to be careful in his future behavior.

On August 22, 2012, Dr. Pera and Dr. Michael Clearfield, the Dean of TUCOM, again met with Patel, but each time they asked Patel about his conduct, he changed the topic and spoke about unrelated subjects, such as America's dysfunctional political system, his own family issues, and racial profiling. Patel also made disparaging remarks about women. Patel was verbally instructed not to come onto campus or to contact any students or staff until notified otherwise. Despite these directives, within hours of the meeting, Touro's staff reported disturbing interactions with Patel in which he slammed the office door of one employee, yelled and pointed his finger at another, and raised his voice to a clinic assistant.

Later on August 22, all seven members of the Professionalism Committee also met without Patel being present to discuss Patel's increasingly erratic and unprofessional conduct. The members concluded Patel needed a focused mental health evaluation and sustained therapeutic treatment and that Touro could not assure the safety of its students and others on campus while he was present. Although their investigation turned up no evidence of direct threats by Patel, the committee decided to refer the matter to "administrative leadership" because the committee felt, based on interviews and student reports, "there is something psychologically troubling this student," which might put the matter beyond the jurisdiction of the committee. The committee did, however, believe it was authorized to deal with "poor judgment and presentation of oneself in a professional

3

manner." The Professionalism Committee recommended that, pending a final decision by Touro's administration, Patel should not be allowed to enter the campus or communicate with other students. This decision was immediately communicated to Dean Clearfield who, after consultation with Dr. Binkerd and the Provost, concurred in the recommendation.

On August 29, 2012, Dean Clearfield and Dr. Binkerd met with Patel and handed him a letter signed by Dean Clearfield advising him that Touro would allow him to take a leave of absence for the remainder of the 2012-2013 school year. He could re-enter TUCOM in August 2013 only if he met certain requirements, including that he seek treatment from a mutually acceptable psychiatrist, refrain from contacting any Touro students during his leave, and refrain from entering campus until cleared by his psychiatrist and TUCOM. Although the letter instructs Patel only that he must not contact other students, Dean Clearfield signed a declaration stating that he and Dr. Binkerd also informed Patel verbally that he must not contact TUCOM faculty, except Dr. Binkerd, who would serve as his TUCOM liaison. During this meeting, Dean Clearfield and Dr. Binkerd also reviewed with Patel his inappropriate behaviors and warned him that his failure to adhere to any of the specified conditions could result in his dismissal.

Meanwhile, Patel had begun to act on his delusional sexual obsession with Dr. Garcia-Russell. He made increasingly bold attempts to contact her at her campus office and at home, by phone, mail and social media. She reported the initial contacts to Drs. Pera and Binkerd on September 21, 2012.

That same day, Dr. Binkerd sent Patel an email directing him to cease these contacts immediately and "to refrain from any contact with any Touro employee or student . . . until the terms of your Dean's Letter have been met." (Underline in original.) Patel was told his contacts with Dr. Garcia-Russell were being "referred to the Professionalism Committee for review and possible action." Dr. Pera also exchanged emails with Patel directing him to attend a meeting on campus on September 24 with representatives of the Professionalism Committee, but Patel responded on the morning of

4

September 24 that he would not attend the meeting because he had been banned from the campus. He said he would consult an attorney instead.

The same date, Dr. Pera sent Patel a letter charging him with failure to comply with the conditions of Dean Clearfield's August 29 letter by continuing to have contact with Dr. Garcia-Russell by email, phone and through her Facebook account, and by failing to find a mutually agreeable psychiatrist for treatment. Dr. Pera reiterated the no-contact directives and set a deadline of October 8 for Patel to obtain a psychiatric evaluation. Dr. Pera again warned Patel he could be dismissed from the program for further non-compliance.[2]

Despite these warnings, Patel continued to act on his delusional infatuation with Dr. Garcia-Russell by sending her cards in the mail at her apartment, addressing them to "Princess Nathalie Garcia-Russell" and using a fabricated sender's name. One card had a large heart on the front and a message on the back saying, "My heart is yours . . . so's everything else." Inside was a music CD entitled "Blessed Union of Souls." For about two weeks in October 2012, Dr. Garcia-Russell also received daily anonymous phone calls at her office and voice mails without messages. Convinced Patel was responsible for the unwanted contacts, Dr. Garcia-Russell again reported the incidents to Dean Clearfield and Drs. Pera and Binkerd on November 1, 2012, but the stalking behavior continued.

On November 1, 2012, Dr. Garcia-Russell received at her apartment an 18-pound box containing a variety of "gifts" and a handwritten letter including the remark: "Mare Isle isn't the most romantic place or . . . is it . . .?? Hmmm . . . ." The nature of the gifts and the explanations accompanying them suggested a close relationship that had never existed between Patel and Dr. Garcia-Russell. The doctor was firmly convinced this

---

[2] Patel failed to obtain the psychiatric evaluation as required by the October 8 deadline. On or about October 11, he sent Dean Clearfield a letter stating he had left the Bay Area on September 24 and had begun treatment on October 11 with a psychiatrist in New York. Patel requested an extension until October 31 to complete the psychiatric evaluation.

5

package, too, came from Patel and believed he was stalking her. She filed a complaint with the police and again alerted her colleagues at TUCOM. The stalking continued with a large envelope delivered to her home on November 10, 2012, which she returned unopened, and with more anonymous calls to her office. By November 13, Dr. Garcia-Russell had a well-founded suspicion that Patel had contacted her apartment manager repeatedly trying to rent an apartment in her building. The next day, Dr. Garcia-Russell sought and was issued a restraining order against Patel.

On November 13, 2012, Touro sent Patel a formal letter alleging unprofessional conduct and directing him to appear for a hearing before the Professionalism Committee the following week. The letter, signed by Dr. Pera, listed allegations that Patel had failed to limit his contacts to Dr. Binkerd, Dr. Pera and Dean Clearfield, failed to appear for the required meeting on September 24, and had "continued to contact certain individuals, by phone and mail, in direct violation of the agreed-to terms." At Patel's request, the hearing was reset for December 6, 2012.

On November 30, 2012, the Professionalism Committee met with Dr. Garcia-Russell to discuss her interactions with Patel. Dr. Garcia-Russell presented to the committee a timeline of Patel's contacts or attempted contacts and evidence of the cards, gifts, and phone calls outlined above.

On December 6, 2012, four of the seven members of the Professionalism Committee, chaired by Dr. Pera, convened the hearing, and Patel attended by phone. Dr. Binkerd, who was not a member of the Professionalism Committee and did not have a vote, attended as Patel's student advocate. Committee members outlined the allegations, including Patel's inappropriate communications with other TUCOM students, as well as his persistent attempts to contact Dr. Garcia-Russell despite being told to stop, indicating the supporting evidence, and giving Patel an opportunity to respond. Patel did not deny the allegations, but became argumentative and agitated. He blamed the problem on a complaint by another student and claimed there had been an agreement that he would be allowed to confront that student in person, with Dr. Pera mediating. Dr. Pera told Patel his dispute with this student was not at issue, and the purpose of the hearing was to

6

review his actions that were considered unprofessional for a medical student or aspiring physician. At that point Patel refused to participate further and abruptly hung up the phone after the hearing had been in session for only about 15 to 20 minutes.

The Professionalism Committee continued to discuss the issues of concern and reviewed information supporting the allegations against Patel for another one-and-a-half to two hours. There was further discussion of the complaints by Dr. Garcia-Russell and the evidence she had presented at the meeting of November 30. The members present unanimously agreed that Patel's behavior was unprofessional, unacceptable to Touro, and unacceptable for someone aspiring to enter the medical profession. Their report was then circulated to the full committee for the absent members' votes. Ultimately there were five votes in favor of dismissal and two dissenting votes. The two dissenters believed Patel's issues may have been due to mental illness, and he should have a psychiatric examination before being dismissed.

The Professionalism Committee sent the recommendation and a report of its proceedings to Dean Clearfield, who accepted the recommendation. On January 4, 2013, Dean Clearfield sent Patel written notice of his immediate dismissal from TUCOM because he violated the conditions imposed when he was granted a leave of absence, namely that he not contact members of the Touro community and refrain from entering campus, among "other transgressions."

After an unsuccessful appeal to the Provost, on June 7, 2013, Patel filed his petition pursuant to Code of Civil Procedure sections 1086, 1087 and 1094.5, seeking a writ of mandate directing Touro to set aside its dismissal decision and to reinstate him as a student.

In addition to its answer and supporting brief, Touro filed declarations from five faculty members and administrators in response, setting forth under oath much of the foregoing background information and attaching documents from the administrative record. On October 21, 2013, the superior court heard argument on the petition and denied it, entering judgment in Touro's favor on November 18, 2013. Patel filed a timely notice of appeal.

7

**DISCUSSION**

Patel claims Touro's dismissal procedure violated its own Handbook, and thereby violated due process, because (1) it failed to give him adequate notice of the disciplinary charges against him; (2) it denied him a fair hearing by taking evidence at the November 30 meeting in his absence and pre-deciding his dismissal, by failing to identify witnesses against him, and by depriving him of the opportunity to confront those witnesses , and (3) the disciplinary panel was improperly constituted and was not impartial.

*I. Standard and Scope of Review*

The remedy of administrative mandamus is available when a student is dismissed from a private university. (*Gupta v. Stanford University* (2004) 124 Cal.App.4th 407, 411–413.) On appeal from denial of such a writ, our role is the same as that of trial court: to determine whether the entity that made the decision abused its discretion. (Code Civ. Proc., § 1094.5, subd. (b); *Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 521; *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 557.) An abuse of discretion is only established if the entity did not proceed in a manner required by law, if its decision is not supported by findings, or if its findings are not supported by substantial evidence in the record. (Code Civ. Proc., § 1094.5, subds. (b) & (c).) We therefore ask only whether the entity's decision "was arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497; see *Perlman v. Shasta Joint Jr. College Dist. Bd. of Trustees* (1970) 9 Cal.App.3d 873, 882 (*Perlman*) [in reviewing the propriety of expulsion of a college student, " '[t]he power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding' "].)

Emphasizing that only an abuse of discretion will justify the courts' intervention in the affairs of a private educational institution, *Banks v. Dominican College* (1995) 35 Cal.App.4th 1545 upheld a private university's decision to dismiss a graduate student in its one-year teaching credential program after "disturbing episodes of unprofessional or

8

unacceptable conduct" during her clinical teaching experience.  (*Id*. at p. 1547.)  The court held the college's decision could be overturned only if found to be "arbitrary and capricious, not based upon academic criteria, and the result of irrelevant or discriminatory factors." (*Id*. at p. 1551.)  Notably, dismissal for lack of professionalism was deemed to be an "academic" dismissal, not a disciplinary one.  (*Ibid*.; see *Board of Curators of University of Missouri v. Horowitz* (1978) 435 U.S. 78, 86–87 [fewer procedural protections for academic dismissal].)

II. *Patel Has Failed to Show an Abuse of Discretion Based on TUCOM's Immaterial Departure from the Handbook's Procedures for Conduct Infractions*

Patel argues that Appendix B of the Handbook, "Touro University California Bylaws and Regulations of the Code of Responsibilities and Rights of the Students of Touro University" (Appendix B), which sets forth procedures for "formal resolution" of "conduct infractions," dictated the required procedures.  This section spells out formal hearing procedures for "any student act allegedly violating acceptable student conduct." Appendix B contains a list of "conduct violations," including matters such as cheating, plagiarism, unlawful use of controlled substances, and physical abuse of others, only one of which would appear applicable to the professionalism concerns about Patel: "[b]ehavior inconsistent with the qualities and ethics described for professionals within the chosen fields."

Touro argues it was not bound to follow the procedures outlined in Appendix B because it was not considering discipline or other redress for a "conduct violation." Instead it was assessing and responding to a problem with an aspect of Patel's professional competence, as well as concerns about his mental health and his potential threat to the safety of himself or others.  Thus, it argues, the Handbook's section on "Professionalism," is controlling.  Professionalism is considered a core competency for medical students and a requirement for graduation.  The Handbook describes a "Process of Handling Professionalism Complaints," which indicates complaints are to be made to the Chair of the Professionalism Committee and will be handled by that committee.

9

Framing their respective positions in this way, the parties devote substantial attention to whether the charges against Patel were in fact governed by Appendix B and to the further issue whether Patel's allegations that Tuoro failed to abide by its Appendix B procedures is a matter of constitutional import. We see no need to entertain debate at that level because, by any reading of the record, the Professionalism Committee's process substantially complied with the Appendix B rules, and any variances were not so significant as to amount to an abuse of discretion. (*New Jersey v. T.L.O.* (1985) 469 U.S. 325, 340 ["maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures"]; *Harwood v. Johns Hopkins Univ.* (2000) 130 Md.App. 476, 484 [747 A.2d 205, 209] [courts must " 'enter the realm of school discipline with caution,' and allow schools flexibility in establishing and enforcing disciplinary procedures"].) We address Patel's arguments about the adequacy of notice, confrontation, and the composition of the committee, in turn, individually.

A. <u>Patel received notice of his violations of professionalism standards</u>

Patel cannot credibly claim he had insufficient notice of the charges of unprofessional conduct resulting in his dismissal. Patel received the November 13 letter in a timely manner; the delay between that letter and the hearing was at Patel's request and gave him plenty of time to prepare his defense.[3] Patel also received early, informal notice of the issues under investigation in three separate meetings with TUCOM administrators on August 20 through 22, 2012. Patel was notified at these meetings of the complaints made by students about his behavior. The August 29 letter informed him that concerns had been expressed "ranging from extremely inappropriate remarks to sexual innuendos to perceived overt threats." The rude interactions with staff were specifically mentioned.

---

[3] In his petition, Patel originally claimed Touro abused its discretion in part because it failed to hold a hearing within ten days of its November 13 notice and failed to serve the notice by registered or certified mail or hand delivery. Besides being de minimis deviations, the failure to hold a hearing within ten days was due to Patel's own request for a delay. It also appears he received the November 13 letter in timely fashion in New York, possibly by personal delivery.

10

Dr. Pera's September 24 letter identified specific professionalism violations, including the unauthorized contacts with Dr. Garcia-Russell by email, phone and through her Facebook account. The letter also cited Patel's failure to find a mutually agreeable psychiatrist for evaluation and treatment and set a deadline of October 8 for compliance. He failed to meet that deadline.

On November 13, 2012, Patel received formal written notice of specific alleged conduct violations which would later become the subject of the Professionalism Committee hearing on December 6. The letter listed Patel's failure to attend a meeting with Dr. Pera on September 24 and his failure to comply with the requirement not to contact anyone affiliated with Touro while on leave, other than Drs. Pera, Clearfield, and Binkerd. Though all of the university's reasons for considering dismissal were not spelled out in a single letter, the various notices over time provided Patel sufficient opportunity to prepare a defense for the hearing.

But Patel also claims he was not notified of the identity and status of his accusers, as required by Appendix B. Before the hearing, Touro notified Patel that Dr. Garcia-Russell was one of those who had raised concerns. The students who had complained about Patel were not named because they had requested anonymity out of fear of Patel. It was not an abuse of discretion for Touro to withhold those names. The Supreme Court has acknowledged it is important "that schools be able to discipline students without subjecting their accusers to confrontation and cross-examination because otherwise fear of retaliation would make students reluctant to give information on disciplinary matters." (*John A. v. San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 306 (*John A.*).) "[I]n some cases revelation of student witnesses' names and requiring the students to testify may subject them to a substantial risk of retaliation. In such a case the witnesses are not readily available. We do not preclude the board from relying upon statements and reports where it finds that disclosure of identity and producing the witnesses would subject the informant to significant and specific risk of harm." (*Id*. at p. 308.) A university must bear in mind the safety of other students who may face retaliation if their identity is disclosed, and it is reasonable for a university to modify its

11

procedural rules when potential witnesses have a legitimate fear of retaliation, as was the case here.

      B.      <u>Patel received a fair hearing on the charges resulting in his dismissal</u>

Patel contends the hearing procedure used by Touro was fundamentally unfair and deprived him of procedural due process and his common law right of fair procedure. (See, e.g., *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657.) We disagree. The hearing opened with a review of the committee's concerns, including a summary of Patel's inappropriate communications and interactions with faculty and students, his failure to attend scheduled meetings, and his failure to abide by the conditions of his leave.

Patel participated in the hearing by phone, and the committee gave him an opportunity to respond to the accusations. The Handbook made clear that Patel was free to have a non-attorney advocate participate in the hearing, but in accordance with Appendix B, he was not allowed to have an attorney. (See *Perlman*, *supra*, 9 Cal.App.3d at pp. 879–880 [representation by legal counsel is not required for a university student to receive a fair hearing].) He was free to present any evidence or arguments in his defense or to ask questions about the allegations, but he did neither. Instead he tried to derail the proceedings with his complaint about another student, and when Dr. Pera tried to pull him back on topic, he hung up the phone.

Because he voluntarily chose to absent himself from the dismissal hearing shortly after it began, Patel is in a poor position to claim the hearing was insufficient or violated his right to due process. (See *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 427–429, 438–439 ["the students and their representatives walked out of the hearing," which then proceeded in their absence, and thus they "never availed themselves even of the due process rights they were afforded"].) As the trial court in our case aptly stated, "A petitioner cannot complain of a due process violation when by his own actions he chooses not to participate."

Patel argues the hearing was unfair because he was unable to confront Dr. Garcia-Russell and the students who accused him of unprofessional conduct. This procedural

12

limitation, in view of the facts, does not amount to a due process violation or an abuse of discretion. "[D]ue process is a flexible concept, as the characteristic of elasticity is required . . . to tailor the process to the particular need. [Citations.] Thus, not every situation requires a formal hearing accompanied by the full rights of confrontation and cross-examination." (*Edward W. v. Lamkins* (2002) 99 Cal.App.4th 516, 532; see, e.g., *Goss v. Lopez* (1975) 419 U.S. 565, 583 [due process does not require right to confrontation in temporary public school suspension].) Indeed, despite Patel's emphasis on the Handbook to support his arguments, the right of confrontation is not specified in Appendix A as a student's right in a disciplinary hearing.

Under the rationale of *John A.*, *supra*, 33 Cal.3d at pages 306-308, the student accusers need not have appeared to testify. And certainly with respect to Dr. Garcia-Russell, confrontation was not required. As of the date of the dismissal hearing, Patel was subject to a civil harassment restraining order which prevented him from having any type of contact with Dr. Garcia-Russell, including by phone. Patel's insistence on a right to confront Dr. Garcia-Russell at the hearing, either in person or by phone, would have put him in violation of the court order. Touro was not required to facilitate such a violation.

Finally, Patel argues the Professionalism Committee "pre-decided" his dismissal at its November 30 meeting, outside of his presence, without reviewing any purported evidence in his favor. He does not specify what that evidence might have been. As Touro points out, the November 30 meeting was not a decisionmaking hearing at all. A key function of the Professionalism Committee was to investigate complaints involving student professionalism issues. The November 30 meeting was an investigatory meeting, not an adjudication. The meeting minutes reflect the committee members met with Dr. Garcia-Russell and discussed her interactions with Patel. The committee never took a vote or issued a recommendation to the Dean about Patel's status after that meeting, as it did after the December 6 hearing. Following the November 30 meeting, the evidence presented by Dr. Garcia-Russell was reviewed and discussed at the December 6 hearing. Since nothing was decided on November 30, Patel's rights were not infringed.

13

C.    Patel is not entitled to relief based on the composition of the committee

Patel argues he was not apprised of the composition of the Professionalism Committee in advance, and thus could not challenge one member before the hearing as he claims he was entitled to do under Appendix B. Specifically, he challenges the absence of student participation in the proceeding, as required by Appendix B, and he objects to the participation of Dr. Pera, which he claims was prohibited by Appendix B and by rules requiring an unbiased decisionmaker. (See *Applebaum v. Board of Directors, supra,* 104 Cal.App.3d at pp. 656–660 [biased decisionmaker tainted proceedings]; but see *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 219 ["[a]bsent a financial interest, adjudicators are presumed impartial"]; *El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 990–992 [immaterial violation of bylaws does not amount to denial of a fair hearing]; *Perlman*, *supra*, 9 Cal.App.3d at p. 883 ["[d]ue process does not forbid the combination of judging and prosecuting in administrative proceedings"].)

Appendix B delineates the composition of a disciplinary committee convened for the purpose of dealing with "conduct infractions," requiring that such a committee include two student members and that the hearing be chaired by a non-voting student moderator. But Appendix B does not purport to dictate the composition of other committees, such as the Professionalism Committee, which appears to have been composed of seven faculty members. While student participation may be desirable in deciding issues relating to ordinary conduct violations proscribed by the Handbook, it is not at all clear that other students would be in a position to make judgments about a fellow student's professionalism, especially where mental illness is suspected. On that issue, the faculty would seem to be in a superior position to judge. In addition, given Patel's mental health issues and his history of erratic and seemingly threatening behavior toward other students, the involvement of other students in decisions affecting his status at TUCOM could have jeopardized their safety. Patel has produced no evidence showing he was prejudiced by the absence of student participation in the hearing.

14

Patel also complains of Dr. Pera's role in chairing the December 6 hearing after having personally "filed charges" against him, claiming it violated Appendix B, which provides that "a committee member will be disqualified if he/she has participated in filing the charge under review." He claims this also amounted to a due process violation because Dr. Pera was biased against him and thus he was deprived of an impartial tribunal. (Cf. *Perlman*, *supra*, 9 Cal.App.3d at p. 883.) The nub of his complaint is that one of the allegations in the November 13 letter was Patel's failure to meet with Dr. Pera himself. Even if Appendix B were deemed controlling, the same rule also states: "Prior involvement in some aspects of the issue under study by a hearing committee member shall not bar a committee member from serving on the committee." Thus, Dr. Pera's involvement in one of many issues the committee reviewed did not disqualify him from serving on the committee or chairing the hearing. More fundamentally, by noting that Patel had missed a meeting with him, Dr. Pera was not filing a "charge" against Patel, but merely documenting his lack of compliance with the terms of his conditional leave. Nothing in the record suggests actual bias on Dr. Pera's part, and his participation in the committee's hearing did not violate due process or Patel's right to fair procedure.[4]

## III.     *Touro's Decision to Dismiss Patel Was Supported by Substantial Evidence*

Patel argues he was not in violation of the August 29 conditions because the Dean's letter only advised him not to contact other TUCOM students and did not mention faculty. This ignores the verbal instructions given him by the administration. The trial

---

[4] In a footnote at the end of his reply brief, Patel mounts a version of the same attack on Dr. Binkerd: "Dr. Binkerd also should be considered to be a biased decision maker even though his stated role was as student advocate." This argument places Dr. Binkerd at the meeting as a decisionmaker, which is inconsistent with our reading of the record. At oral argument, Patel's counsel offered yet another spin on Dr. Binkerd's role, accepting that Dr. Binkerd did in fact have the role of student advocate but arguing he was compromised in that role. As noted above, the Handbook made clear Patel was free to designate any non-lawyer to speak on his behalf. These arguments were, in any case, forfeited by failure to raise them in a timely manner. (*People v. Crow* (1993) 6 Cal.4th 952, 960, fn. 7 [declining to address issue raised for first time at oral argument]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [for "[o]bvious reasons of fairness," declining to consider issue raised by appellant for first time in reply brief].)

court concluded in its order denying Patel's petition that Touro's decision to dismiss Patel "was not irrational, arbitrary or capricious," that "any other decision by the University would have been inappropriate given the totality of circumstances presented," and that Patel's "behavior was inconsistent with being a medical professional." We agree.

Touro made repeated attempts to counsel Patel about his unprofessional conduct and to warn him of the consequences of engaging in further similar behavior. He was allowed to take a year's leave of absence to obtain mental health treatment, subject to certain requirements. He then failed to comply with those requirements.

First, Patel failed to obtain a psychiatric evaluation and treatment plan from a mutually agreed upon psychiatrist in a timely manner. Second, he repeatedly attempted to contact Dr. Garcia-Russell long after he had been given clear verbal and written instructions to refrain from doing so. While Patel hid his identity in making such contacts, Dr. Garcia-Russell explained her reasons for believing it was Patel who repeatedly called her office, sent her cards and gifts at home, and tried to rent an apartment in her building. Her deduction was reasonable. When the Professionalism Committee confronted Patel at his hearing about these contacts, he did not deny them.

Touro treated Patel's behavior largely as a mental health issue, rather than a "conduct infraction" that would be governed by Appendix B. The administration initially sought professional assistance in addressing the mental health issue, but because Patel did not immediately cooperate—and because the committee members believed it was "beyond the[ir] authority" to address Patel's psychological difficulties—TUCOM proceeded under its professionalism standards rather than under routine disciplinary procedures. From the beginning, that was how the matter was handled. To state the obvious, Touro is a school dedicated to the training of medical professionals. It did not violate due process or any common law right of fair procedure, and it was not an abuse of discretion, for Touro to address the circumstances presented here as a matter of professional competence rather than discipline for misconduct. Thus, Touro properly determined that Patel's behavior not only violated the requirements of his leave, but also

16

fell below the standards of professionalism that it seeks to inculcate in its students in anticipation of their entering into the medical field.  The decision to dismiss him was reasonable and well within Touro's authority, made after a hearing that afforded Patel notice and an opportunity to present his defense, even though he elected to participate only briefly.  Patel's showing provided no basis for the trial court to issue writ relief.

## DISPOSITION

The judgment is affirmed.


_____
Streeter, J.


We concur:


_____
Ruvolo, P.J.


_____
Rivera, J.

17